LIPEZ, Circuit Judge.
In the summer of 1988, twelve-year-old Darlene Tiffany Moore was killed by a stray bullet during a gang-related shooting in Boston. Appellant Shawn Drumgold was tried and convicted of Moore’s murder in Massachusetts state court in the fall of 1989. After serving fourteen years of his life sentence, Drumgold moved for a new trial on the ground that exculpatory evidence had been withheld by several Boston police officers involved in his prosecution, including appellee Timothy Callahan, a homicide detective. Drumgold’s motion was granted, the district attorney’s office declined to prosecute him again, and he was released from prison in 2003.
Shortly after his release, Drumgold filed a civil action in federal district court pursuant to 42 U.S.C. § 1983 against Callahan, Boston police commissioner Francis Roache, police officers Paul Murphy and Richard Walsh, and the City of Boston. Drumgold alleged that his constitutional due process rights were violated by the withholding of material exculpatory evidence during his criminal trial, in contravention of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). In 2008, a jury determined that Callahan had withheld some evidence but deadlocked on whether his failure to disclose that evidence had caused Drumgold’s conviction.[1] As a result, a mistrial was declared and a retrial held in 2009. The retrial jury also found that Callahan had withheld evidence and determined that his actions had caused Drumgold’s conviction. Drumgold was awarded damages of $14 *33 million — $1 million for each year he spent in prison.
On appeal, Callahan argues that he is entitled to judgment as a matter of law on three different grounds, namely, that the withheld evidence is not material within the meaning of Brady, that he is entitled to qualified immunity for his actions, and that the scope of the retrial was too broad. After careful consideration, we reject these arguments. However, we agree with Callahan’s alternative claim that he is entitled to a new trial because the district court judge erred in instructing the retrial jury on causation. Accordingly, we remand this case to the district court for a new trial.
I.
A. The 1989 Criminal Trial
On August 19,1988, Moore was shot and killed by two masked men while sitting on a mailbox in front of her mother’s home in Boston. Ten days later, city police officers arrested Drumgold and his friend Terrance Taylor. They were charged with first-degree murder and brought to trial in Massachusetts state court in the fall of 1989. Phil Beauchesne, an assistant district attorney, led their prosecution. The prosecution’s theory of the case, laid out in Beauchesne’s opening statement, was that the bullet that killed Moore was intended for Chris Chaney, a gang member who was standing nearby. Chaney was thought to be responsible, along with a man named Mervin Reese, for the shooting of Romero Holliday, a rival gang member whom the prosecution believed to be an associate of Drumgold’s.
At trial, Beauchesne called a series of witnesses who tied Drumgold, and in some instances Taylor, to Moore’s murder. One of these witnesses (and the focus of this appeal) was Ricky Evans.[2] Evans testified that he saw Drumgold and Taylor carrying guns shortly before Moore was killed, about two blocks from the murder scene. According to Evans, Taylor told Drumgold at that time that he knew where they could find Chaney and Reese, Holliday’s supposed assailants. The next time Evans encountered Drumgold and Taylor, approximately an hour after the shooting, they were no longer armed and Drumgold appeared nervous. Evans heard Taylor say that their guns were “hot” and had been “stashed” in a safe location.
Evans was impeached with his past criminal activity and other bad acts, as well as with evidence that police officers investigating Moore’s murder helped him clear up some outstanding warrants. Taylor’s counsel also noted that it took Evans ten months to come forward with information regarding Moore’s death and probed his motivation for testifying. Evans explained that he “didn’t want to get involved” at first but later changed his mind: “I just felt like [Moore’s mother] lost her daughter so why not go and tell the truth when you can.... I got a daughter myself and I wouldn’t want her to be sitting on the mailbox and get shot.”
After the prosecution rested, the state court dismissed the charges against Taylor, finding insufficient evidence to permit a reasonable jury to convict him. Drum-gold then testified in his own defense, denying any part in Moore’s death. Drum-gold offered an alibi, corroborated by his friend Paul Durand as well as by Taylor, that he was drinking wine coolers with Durand outside Taylor’s girlfriend’s house at the time of the shooting and only later ended up near the murder scene, which was half a block from where his girlfriend and daughter lived. Drumgold also pre *34 sented third-party culprit evidence suggesting that Moore was killed by two prominent members of Holliday’s gang, Theron Davis and London Williams, in a failed attempt to take revenge on Chaney for the attack on Holliday, as well as for an incident in which Chaney stabbed Davis in the hand a month before Moore’s death. There was a stipulation at trial that, on the day of Moore’s murder, a car dealership loaned Williams a white Suzuki jeep — the exact type of vehicle that witnesses said the shooters were driving. One witness testified that Davis and Williams drove past Chaney in the same type of vehicle half an hour before Moore was shot, calling out from the car, “we’ll be back.” A few hours later, Davis was stopped in a white Suzuki jeep by a Boston police officer.
Once Drumgold concluded his defense, the charges against him went to the jury, which returned a guilty verdict on October 13, 1989, after deliberating less than one full day. Drumgold was sentenced to life in prison.
B. The 2008 Civil Trial
In 2003, fourteen years after his conviction, Drumgold moved for a new trial in Massachusetts state court on the basis that exculpatory evidence casting doubt on the testimony of several prosecution witnesses was not disclosed to him during his 1989 criminal trial. Drumgold’s motion was granted, and he was released from prison after the district attorney’s office entered a nolle prosequi, indicating that it was abandoning his prosecution. Drum-gold then filed a civil suit in federal district court under 42 U.S.C. § 1983, alleging, as relevant to this appeal, that Callahan violated his constitutional due process rights by withholding evidence that would have discredited Ricky Evans.[3] Drumgold’s civil claims against Callahan went to trial in the spring of 2008.
At the civil trial, Evans testified on Drumgold’s behalf that he had perjured himself during the 1989 criminal trial in order to please Callahan.[4] Evans explained that he first met Callahan in December 1988, when Callahan was investigating the execution-style murder of Evans’s cousin by a person named Treas Carter (“the Treas Carter case”). By the time Callahan was assigned to Drumgold’s case, about six months later, the two men had become “close like friends.” Evans had also learned that he could profit by aiding Callahan’s investigations: “[I]t was like if I told him what he wanted to hear, I could get what I wanted, and I started getting what I wanted so I started giving him what he wanted to hear.”
During one conversation about the Treas Carter case, Callahan asked Evans if he had any information regarding Moore’s death. When Evans indicated that he did, Callahan produced a picture of Drumgold and said, “[t]his is the guy here.” According to Evans, there was no convincing Callahan that Drumgold was not the culprit:
I knew it wasn’t Shawn that had did the shooting that night, you know, because everybody in the neighborhood said it was [Theron Davis], But it was like [Callahan] wouldn’t take, you know, “no” *35 for an answer that it was not Shawn. You know, he wouldn’t take it. Like, after, you know, when I tell him [Davis] did it, it was like I was just pointing at a blank picture.
Some time after this initial discussion— Evans could not remember exactly when, except that it was on “a summer night” in 1989 — Callahan arranged for Evans, who was homeless, to stay at a Howard Johnson hotel in Boston. Evans claimed that, during the lead-up to Drumgold’s criminal trial, he and Callahan met on several occasions at the hotel restaurant, where Callahan prepared him to testify for the prosecution by feeding him facts that implicated Drumgold in the shooting. In the eight months that Evans recalled boarding at the hotel, he never paid a bill, he was permitted to come and go as he liked, and he was able to charge meals at the hotel restaurant to his room. No one monitored his visitors or kept track of his whereabouts. In addition, Evans testified that, while he was at the hotel, Callahan provided him with money upon request: “If I needed, like, say if I needed money or something, I would just give him a call, I’d call him, and, you know, he’d like, drop me off $30, $40, $50.”
These benefits were of great value to Evans in his impoverished state:
I was living in a hotel I could bring anybody that I wanted to, I mean, I could feed them, my whole family. It was a big deal to me. I was moved off the street into a hotel. I didn’t have to worry about nothing. I needed money, I gave them a call.... I didn’t have anything to worry about, take me off the street and put me in like a five star. See, I was wearing the same clothes every day that week, then I get Detective Callahan ... I didn’t have to worry about it no more, so I told them what they wanted to hear.
None of these benefits were disclosed to Drumgold prior to or during his criminal trial.
Callahan disputed the main thrust of Evans’s testimony. He denied feeding Evans any information about Moore’s murder or inducing Evans to testify in any particular fashion during the 1989 criminal trial. Callahan testified that he placed Evans in the hotel only a few weeks before the criminal trial — on September 12, 1989— and that he did so out of concern for Evans’s safety as a cooperating witness in Drumgold’s case, as well as in the Treas Carter case. He also said that he only gave Evans money ($20) on one occasion, because Evans was hungry and had no means to purchase food. Callahan acknowledged that there was no contemporaneous written documentation of either benefit, although he was “sure” he reported to Beauchesne that he had “placed [Evans] in a hotel.” He also recalled disclosing Evans’s accommodations to the prosecutor assigned to the Treas Carter case, Paul Connolly, who worked down the hall from Beauchesne. A January 1990 memorandum to a witness advocate from Connolly stated: “[Y]ou will remember that our witness Ricky Evans was in need of housing” and “we had in effect relocated him to a hotel.” However, neither Beauchesne nor Connolly had any memory of discussing Evans’s hotel accommodations with Callahan.
To help the jury understand the role Evans played in the 1989 criminal trial, transcripts of that proceeding were read aloud during the 2008 civil trial and admitted into evidence as exhibits. Against this backdrop, the district judge sent the case to the jury in two phases. In the first phase, the jury was directed to complete a special verdict form that, in pertinent part, included the following two questions:
*36 (1) Has the Plaintiff, Shawn Drumgold, proven by a preponderance of the evidence that Defendant Timothy Callahan violated his right to a fair trial by withholding exculpatory evidence from prosecutors, manufacturing evidence, and/or obtaining false statements regarding Ricky Evans being housed at a hotel and provided with meals?
(2) Has the Plaintiff, Shawn Drumgold, proven by a preponderance of the evidence that Defendant Timothy Callahan violated his right to a fair trial by withholding exculpatory evidence from prosecutors, manufacturing evidence, and/or obtaining false statements regarding Ricky Evans being given substantial amounts of money?
The jury answered “no” to the first question and “yes” to the second. Apprehending the inherent ambiguity in the phrase “substantial amounts of money,” the district judge proposed to ask the jury to clarify its response to the second question. When both parties objected, the judge did not seek the clarification.
Proceeding to the second phase, the judge instructed the jury to consider whether Callahan’s withholding of evidence concerning the provision of money to Evans had caused Drumgold’s conviction and, if so, the amount of damages due to Drumgold. The parties presented additional evidence and delivered closing arguments as to causation and damages. After a week of deliberations, the jury reported that it could not agree on the causation question, and the judge declared a mistrial.
Immediately following the declaration of a mistrial, Callahan requested the entry of a final judgment on all issues decided by the jury in his favor. The judge said that Callahan’s request seemed appropriate:
Entry of judgment would make sense with respect to ... the issues that were finally decided by the jury on Officer Callahan.... In other words, when the jury said no liability for Officer Callahan with respect to ... all aspects of Ricky Evans except for the money, that judgment it seems to me, can enter.
She then addressed the scope of a possible retrial:
If there would be a retrial ... I’m not sure that it would be possible to separate out as a matter of fact the issues about the hotel, et cetera, from the issues of money so that a retrial on Officer Callahan I think would cover the entire story, but the only question that that jury would be asked is about the money.
The judge elaborated:
[E]ven the finding of liability for Officer Callahan on the money would ... be up in the air because the jury — that wasn’t a complete verdict, there had to have been a verdict of that finding plus proximate cause, so that’s not a complete verdict, and judgment should not be entered one way or the other with respect to that.
However, when it later became clear that a retrial would take place, the judge declined to enter judgment in Callahan’s favor on any issues relating to Evans that were decided in the 2008 trial. She ruled that the retrial would not be limited to the causation question on which the first jury hung, but also would revisit the antecedent question of whether Callahan withheld evidence that he gave Evans money, as well as the question of whether he withheld evidence that he housed Evans at a hotel.
C. The 2009 Retrial
The retrial was held in September 2009. Much of the evidence mirrored the evidence in the 2008 civil trial, including transcripts from the 1989 criminal trial. Ev *37 ans repeated his prior testimony that he perjured himself during the criminal trial in order to curry favor with Callahan, that Callahan fed him information implicating Drumgold in Moore’s murder, and that Callahan housed him for eight months at a Howard Johnson hotel and gave him money “whenever [he] needed it.” Evans also testified that he informed Callahan that “everybody in the neighborhood” believed Theron Davis had killed Moore, but Callahan was “possessed with Shawn Drum-gold”: “[T]he only person that he wanted to hear about was Mr. Drumgold. He didn’t want ... to hear anything about [Davis], he wanted to finger Shawn.”
Callahan again denied having fed Evans any information or provided any inducements to him. He testified that he placed Evans in the hotel only a few weeks before the criminal trial and that he did so in order to “guarantee not only his safety but his attendance before the court.” Callahan also testified that he disclosed Evans’s accommodations to Beauchesne and to Connolly, although he did not document that benefit in a written report. He added that the only occasion on which he gave Evans money (again, $20) was when he first took Evans to the hotel, because Evans had not eaten that day. The attorney who had represented Drumgold at his criminal trial testified that, even if he had known Callahan gave Evans $20 for food, “that ... probably would not have been an area that [he] would have gone into” in cross-examining Evans.
The judge again sent the case to the jury in two phases. The special verdict form used in the first phase included the following questions:
(1)Has the Plaintiff, Shawn Drumgold, proven by a preponderance of the evidence that Defendant Timothy Callahan intentionally or recklessly withheld exculpatory evidence from prosecutors regarding Ricky Evans being housed at a hotel and provided with meals?
(2) Has the Plaintiff, Shawn Drumgold, proven by a preponderance of the evidence that Defendant Timothy Callahan intentionally or recklessly withheld exculpatory evidence from prosecutors regarding money given to Ricky Evans?
The jury answered “yes” to both questions.[5] As a follow-up to the second question, the special verdict form directed the jury to determine the amount of money Callahan gave Evans. The two choices were “$20” and “more than $20.” The jury marked “$20.” The special verdict form then put these questions to the jury:
(3) Has the Plaintiff, Shawn Drumgold, proven by a preponderance of the evidence that the evidence withheld by Defendant Callahan was material?
(4) Has the Plaintiff, Shawn Drumgold, proven by a preponderance of the evidence that the evidence withheld by Defendant Callahan was a legal cause of Mr. Drumgold’s conviction?
The jury answered “yes” to both questions, finding Callahan to be liable. That finding concluded the first phase of the retrial. In the second phase, the jury awarded Drumgold $14 million in damages.
This appeal followed. Because there was no “final decision” that could be appealed after the 2008 trial, 28 U.S.C. § 1291; see also Baetjer v. Garzot Fernandez, 329 F.2d 798, 799 (1st Cir.1964) (per curiam), we discuss Callahan’s claim that there never should have been a 2009 retri *38 al, as well as his claims relating to the 2009 retrial.
II.
We first address the three issues that Callahan claims would entitle him to judgment as a matter of law. After rejecting Callahan’s arguments on these issues, we proceed to his alternative assertion that he is entitled to a new trial because the causation instruction given to the retrial jury was erroneous. Since we agree with Callahan on that claim, we do not consider his other arguments for a new trial or further proceedings.[6]
A. The Materiality of the Withheld Evidence
Callahan argues that none of the evidence he was found to have withheld during Drumgold’s criminal trial is material within the meaning of Brady. We provide an overview of Brady before turning to the merits of this issue.
1. Brady
Brady was an “extension” of a line of cases beginning with Mooney v. Holohan, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935), and Pyle v. Kansas, 317 U.S. 213, 63 S.Ct. 177, 87 L.Ed. 214 (1942), in which the Supreme Court held that a state actor violates a criminal defendant’s due process rights by the knowing use of perjured testimony or the deliberate suppression of evidence leading to the defendant’s conviction. 373 U.S. at 86, 83 S.Ct. 1194; see also Kyles v. Whitley, 514 U.S. 419, 432, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (noting that Brady “can trace its origins to early 20th-century strictures against misrepresentation”). The duty that these cases established has always applied equally to prosecutors and law enforcement officers. See Haley v. City of Boston, 657 F.3d 39, 50 (1st Cir.2011); Limone v. Condon, 372 F.3d 39, 47 (1st Cir.2004).
Brady broke new ground in holding that a prosecutor also violates a defendant’s due process rights merely by failing to disclose material evidence in his possession that is favorable to the defendant, irrespective of the good or bad faith of the prosecutor. See 373 U.S. at 87, 83 S.Ct. 1194. As a result, Brady is “sometimes referred to as imposing a no-fault disclosure obligation” on prosecutors. Haley, 657 F.3d at 48; see also Porter v. White, 483 F.3d 1294, 1305 (11th Cir.2007) (“The Brady rule ... imposes a no-fault standard of care on the prosecutor.”). Subsequent to Brady, the Supreme Court clarified that this affirmative disclosure obligation also encompasses evidence known only to law enforcement officers and not to prosecutors. See Kyles, 514 U.S. at 437-38, 115 S.Ct. 1555; see also Strickler v. Greene, 527 U.S. 263, 280-81, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999); Haley, 657 F.3d at 49. Although “the responsibility for obtaining and disclosing ... evidence remains the duty of the prosecutor,” Haley, 657 F.3d at 49, law enforcement officers have a correlative duty to turn over to the prosecutor any material evidence that is favorable to a defendant, see Moldowan v. City of Warren, 578 F.3d 351, 381 (6th Cir.2009); McMillian v. Johnson, 88 F.3d 1554, 1567 (11th Cir.1996). Evidence is favorable to a defendant if it is either exculpatory or impeaching in nature. See United States v. Bagley, 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). Evidence is material *39 if there is a “reasonable probability” that, had it been disclosed, the result of the proceeding would have been different. Id. at 682, 105 S.Ct. 3375.[7] “The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.” Kyles, 514 U.S. at 434, 115 S.Ct. 1555. Thus, a reasonable probability exists when the withholding of evidence undermines confidence in the outcome of the trial. See id.; Bagley, 473 U.S. at 682, 105 S.Ct. 3375.
We have been careful to distinguish between the proscription originating in Mooney and Pyle against the deliberate suppression of evidence and the more recent affirmative disclosure obligation announced in Brady. See Haley, 657 F.3d at 46. The allegations in this case primarily go to deliberate suppression. However, the record does not permit us to exclude the possibility that Callahan merely failed to disclose evidence with a less culpable state of mind, particularly in light of the retrial jury’s finding that he acted “intentionally or recklessly.”[8] We therefore construe Drumgold’s invocation of Brady as shorthand for his full complement of due process rights, including both those articulated in Mooney and Pyle and those first described in Brady itself. See Strickler, 527 U.S. at 281-82, 119 S.Ct. 1936 (explaining that “a true Brady violation” involves evidence that was “suppressed by the State, either willfully or inadvertently”).
2. Analysis
With this framework in mind, we focus on the merits of the materiality issue, beginning with the 2008 civil trial and then moving to the 2009 retrial. There are serious questions as to whether Callahan properly preserved this issue for our review in either proceeding. If the issue was preserved, our review is de novo. See Zachar v. Lee, 363 F.3d 70, 73 (1st Cir.2004). If not, our review is for plain error. See Simon v. Navon, 71 F.3d 9, 13 (1st Cir.1995). However, since Callahan’s challenge fails even if we apply the standard of review most favorable to him, we will assume the issue is preserved and review de novo whether he is entitled to judgment as a matter of law. See Zachar, 363 F.3d at 73. “In undertaking this review, we look to all evidence in the record, drawing all reasonable inferences therefrom in [Drum-gold’s] favor, and resist the temptation to weigh the evidence or make our own credibility determinations.” Id. We may rule in Callahan’s favor only if no reasonable person could view the withheld evidence as material. See id.; Correa v. Hosp. San Francisco, 69 F.3d 1184, 1191 (1st Cir.1995).
a. The 2008 Trial
To recap, the jury in the 2008 trial found that Callahan withheld evidence that he provided Evans with “substantial *40 amounts of money.” The question is whether a reasonable jury could view that evidence as material.
Evans was one of the prosecution’s star witnesses during Drumgold’s criminal trial. As described above, he testified that, shortly before Moore was killed, he saw Drumgold and Taylor carrying guns near the murder scene. He also testified that Taylor told Drumgold at that time that he knew where they could find Chris Chaney and Mervin Reese, whom Beauchesne identified in his opening statement as the intended targets of Moore’s shooting. Finally, Evans testified that when he next encountered the pair, about an hour after the shooting, Drumgold appeared anxious and Evans heard Taylor say that their guns were “hot” and had been “stashed” in a safe location.
To be sure, other witnesses also linked Drumgold to Moore’s death. Chris Cousins testified that he visited the wounded Romero Holliday in the hospital shortly before Moore was killed. There, Cousins heard Holliday tell Drumgold and Taylor that Chaney and Reese had shot him, prompting Drumgold and Taylor to assure Holliday that they were “going to get who did it” in retaliation. Another witness, Vantrell McPherson, testified that she saw Drumgold and Taylor two streets away from where Moore was shot approximately three hours before the shooting, and that Taylor had said to Drumgold, “[c]ome on, Shawn, you know we got to go do this,” although McPherson had not known what the two men were talking about.
Two witnesses claimed to have seen Drumgold near the scene of Moore’s shooting shortly after it occurred. Mary Alexander, who lived a few blocks away, testified that she heard a gunshot and then saw a man whom she identified in court as Drumgold climb over a fence behind her house with a gun tucked into his waistband. Tracy Peaks, a neighbor of Alexander’s, testified that a man she recognized as Drumgold walked casually by her home just after Moore was killed. A third witness, Eric Johnson — who had been leaning on the mailbox where Moore was perched and who “kn[e]w [Drumgold] from the neighborhood” — testified that he suspected one of the masked shooters was Drumgold, largely because one shooter appeared “bowlegged,” as Johnson believed Drum-gold to be.
However, the testimony of many of these witnesses was called into serious doubt. On cross-examination, Drumgold’s attorney elicited from Alexander the admissions that she had not initially been able to pick out Drumgold from a photo array after the shooting and that, before identifying him in court, she had seen Drumgold’s picture in a Boston newspaper alongside an article describing him as Moore’s killer. In addition, Alexander said that Drumgold appeared to be significantly shorter than the man whom she saw climb a fence behind her house. Drum-gold’s attorney also got Johnson to concede that he was not certain the bowlegged shooter was Drumgold: “I’m not going to say it was Shawn---- I say he looked similar to Shawn. I can’t come out and say straight it was Shawn. I don’t know.” Romero Holliday testified that Chris Cousins never visited him in the hospital, where Cousins claimed to have overheard Drumgold and Taylor promise to “get” whomever had shot Holliday. In fact, Holliday claimed that he did not even know Drumgold at the time of Moore’s murder.
Evans’s testimony, too, was impeached. There was evidence at trial of his past criminal activity and other bad acts, as well as evidence that police officers investigating Moore’s death assisted him with outstanding warrants. Taylor’s counsel *41 also questioned why Evans did not come forward with information until ten months after the shooting. The existence of this other impeachment evidence is relevant to the claim here insofar as it offered a reason to disbelieve Evans even without the withheld evidence. See United States v. Brandao, 539 F.3d 44, 64 (1st Cir.2008); Mastracchio v. Vose, 274 F.3d 590, 603 (1st Cir.2001). Still, its impact at trial was countered by Evans’s insistence that his motivation for testifying was sympathy for Moore’s mother: “I just felt like she lost her daughter so why not go and tell the truth when you can.... I got a daughter myself and I wouldn’t want her to be sitting on the mailbox and get shot.” Evidence that Callahan gave Evans “substantial amounts of money” for assisting with the investigation and prosecution of Drum-gold could have put the lie to that claim.
The record is mixed as to when Evans received the money in question. By all accounts, it was while he was living at the Howard Johnson hotel. Evans was unable to recall the exact date that he moved into the hotel, except that it was on “a summer night” in 1989. He also could not recollect when he left the hotel, although it was some time after Drumgold’s criminal trial concluded. In all, Evans estimated that he lived at the hotel for eight months. According to Callahan, however, Evans arrived at the hotel only a few weeks before the criminal trial — on September 12, 1989. This chronology is important because, as Callahan points out, Evans’s criminal trial testimony was consistent with pretrial statements he made as early as June 21, 1989. If these statements preceded Evans’s receipt of money from Callahan, disclosure of that benefit might have made a smaller splash at the criminal trial. See Mastracchio, 274 F.3d at 603-04.
Although it is hardly conclusive, there was sufficient evidence in the 2008 trial— drawing all reasonable inferences from the record in Drumgold’s favor, see Zachar, 363 F.3d at 73 — that Evans was already living in the Howard Johnson hotel at the time of his pretrial statements. Drum-gold’s criminal trial ended on October 13, 1989. Given Evans’s testimony that he departed the hotel some time afterward, and his estimation that he boarded at the hotel for eight months in total, he could have arrived there before June 21, 1989, and so he could have been receiving cash assistance from Callahan before he gave pretrial statements to him. This timeline is compatible with Evans’s memory of moving into the hotel on “a summer night.”[9]
As a result, there is a reasonable probability that, if Callahan’s provision of “substantial amounts of money” to Evans had been disclosed during the 1989 criminal trial, the result of that proceeding would have been different. This is not to say that Evans’s criminal trial testimony was, on its own, sufficient to support Drum-gold’s conviction. After all, his testimony was equally inculpatory of Taylor, against whom the state court dismissed all charges. Nevertheless, Evans’s testimony was crucial in connecting the accounts of other prosecution witnesses against Drum-gold, and evidence that he received a significant financial benefit from Callahan might well have affected the jury’s perception of his credibility.
b. The 2009 Retrial
The foregoing analysis applies equally to the retrial jury’s determination that Callahan withheld evidence that he provided Evans with free lodging. We have no *42 doubt that a reasonable jury could view the lodging evidence as material, the same as evidence that Callahan gave Evans “substantial amounts of money.” Those benefits were a “big deal” to Evans and transformed his quality of life. There is a reasonable probability that disclosure of the lodging benefits would have changed the outcome of Drumgold’s criminal trial.
Disclosure of evidence that Callahan gave Evans $20 to purchase food on one occasion would not have had the same effect, however. That sum is too small to have made a difference in the particular circumstances of this case. Indeed, the lawyer who represented Drumgold during his criminal trial conceded in the 2009 retrial that he would not have cross-examined Evans about a gift of $20. As a result, no reasonable jury could regard this evidence as material.
B. Qualified Immunity
Callahan argues that, even if the evidence he withheld was material, he is entitled to judgment as a matter of law on the basis of qualified immunity because it was not clearly established at the time of Drumgold’s criminal trial that he had any affirmative disclosure obligation under Brady. Again, there are serious questions about whether Callahan preserved this issue for our review. However, because Callahan’s argument fails in any event, we will once more assume the issue is preserved and apply a de novo standard of review. See Walden v. City of Providence, 596 F.3d 38, 52 (1st Cir.2010); Guillemard-Ginorio v. Contreras-Gómez, 585 F.3d 508, 525-26 (1st Cir.2009). Throughout, we discuss the 2008 trial and the 2009 retrial together.
1. The Qualified Immunity Doctrine
“Qualified immunity is a judge-made doctrine designed to ‘balance two important interests — the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.’ ” Haley, 657 F.3d at 47 (quoting Pearson v. Callahan, 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) (internal brackets omitted)). The doctrine thus protects from liability for civil damages all public officials other than those who, “from an objective standpoint, should have known that their conduct was unlawful.” Id. (internal quotation marks omitted); see also Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).
The qualified immunity inquiry has two parts. See Pearson, 555 U.S. at 232, 129 S.Ct. 808; Maldonado v. Fontanes, 568 F.3d 263, 269 (1st Cir.2009). A court must decide whether the plaintiff has made out a violation of a constitutional right and, if so, whether the right was clearly established at the time of the violation. See Maldonado, 568 F.3d at 269. This second part, in turn, has two aspects. See id. The first focuses on the clarity of the law at the time of the violation. See id. The other aspect focuses more concretely on the facts of the particular case and whether a reasonable defendant would have understood that his conduct violated the plaintiffs constitutional rights. See id. The “salient question” is whether the state of the law at the time of the violation gave the defendant fair warning that his particular conduct was unconstitutional. Id. (citing Hope v. Pelzer, 536 U.S. 730, 741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002)).
2. Application
We have already rejected Callahan’s argument that the exculpatory evidence he withheld is not material within the meaning of Brady. It follows that *43 Drumgold has made out a violation of his constitutional due process rights. See Brady, 373 U.S. at 87, 83 S.Ct. 1194. The question we now confront is whether those rights were clearly established at the time of the 1989 criminal trial.
The essence of Callahan’s argument is that the affirmative disclosure obligation Brady imposed on prosecutors in 1963 was not expanded to include law enforcement officers until Kyles was decided in 1995. That is true, so far as it goes. See Haley, 657 F.3d at 48-49. As we have said, though, this case also involves the deliberate suppression aspect of Brady. There can be no doubt that, under the line of cases running from Mooney and Pyle to Brady, the law was firmly settled at the time of Drumgold’s criminal trial that a law enforcement officer may not deliberately suppress material evidence that is favorable to a defendant. See id. at 49-51; Limone, 372 F.3d at 45; Newsome v. McCabe, 256 F.3d 747, 752-53 (7th Cir.2001); McMillian v. Johnson, 88 F.3d 1554, 1568-69 (11th Cir.1996).
Moreover, to the extent that Callahan acted deliberately, a reasonable officer in his position plainly would have appreciated the wrongfulness of his conduct. Callahan claims that a reasonable officer would not have recognized the evidence in question as material because Drumgold’s lawyer had not bothered to cross-examine another prosecution witness, Travis Johnson, on the fact that the district attorney’s office paid for his accommodations during the criminal trial. However, Johnson had to travel to Boston from another state to testify, and the benefits he received were tailored to facilitate his appearance at the trial. By contrast, viewed in the light most favorable to Drumgold, see Walden, 596 F.3d at 52, the benefits Evans received had little to do with ensuring his availability to testify or, for that matter, his safety as a cooperating witness. Evans was permitted to remain in the Howard Johnson hotel for eight months, he was free to come and go as he pleased, and no one monitored his whereabouts. A reasonable officer would have discerned the difference between the open-ended benefits Evans received and the far more limited benefits Johnson received. As a result, there is no basis for awarding Callahan judgment as a matter of law on qualified immunity grounds.[10]
The dissent’s lengthy discussion attempting to show that Callahan is entitled to qualified immunity is flawed both factually and legally. As a threshold matter, the dissent argues that Drumgold never raised a claim related to the hotel evidence under “the Mooney line of cases” and contends that it is unfair to allow the *44 belated introduction of such a claim on appeal. Although Drumgold did not cite Mooney and Pyle by name, the due process claim those cases support — that Callahan deliberately withheld material impeachment evidence — was a central part of the case as tried. Indeed, in objecting to the district court’s proposed jury instructions for the 2009 trial, Callahan argued that “the jury should be explicitly informed that it is the intentional suppression — that is, the intentional withholding of evidence — that is the core allegation at issue.” He made similar assertions in his Memorandum of Law in Support of His Requested Jury Instructions, where he stated, inter alia, that “[t]he jury should ... be instructed that the burden remains on Drumgold at all times to prove intentional and deliberate suppression of evidence. ...” The suppressed evidence at issue was the provision of hotel and cash benefits to Evans, conduct distinct from Drumgold’s allegation that Callahan had framed him by manufacturing evidence and inducing Evans to testify falsely.
What matters is not the nomenclature of Drumgold’s withholding-of-evidence claim — whether we characterize it as “Brady-based” or “Mooney-based” — but what the parties, the court, and the jury understood about the nature of the claim. The instructions offered by Callahan and given by the court both required a finding of intentional or reckless conduct,[11] and the jury verdict form was likewise framed that way. Hence, there is no lack of notice problem or any other unfairness associated with Drumgold’s deliberate suppression claim.
Moreover, the omission of citations to Pyle and Mooney in Drumgold’s briefing of his Brady claim on appeal does not mean that he has discarded the claim that Callahan deliberately suppressed evidence. As we have explained, Drumgold’s invocation of Brady can only reasonably be understood to broadly state the scope of his constitutional claim against Callahan, not to limit it to the less egregious failure to disclose. It turns the Brady principle on its head to say that a constitutional due process claim exists under Brady if a police officer allegedly failed to fulfill an affirmative obligation to disclose evidence irrespective of fault, but not if the officer is alleged to have deliberately suppressed that same evidence. In arguing that Drumgold’s “Brady ” claim covers only the affirmative obligation to disclose evidence — an obligation that was not clearly established for police officers at the time of Callahan’s alleged actions — the dissent slices away the foundational assumption of Brady that deliberate suppression of material evidence is a constitutional violation. See Strickler, 527 U.S. at 282, 119 S.Ct. 1936 (stating that “a true Brady violation” includes instances where evidence was willfully suppressed by the state).
The dissent’s confinement of Brady to no-fault nondisclosure claims, while describing a Mooney claim as one of “intentional framing,” implausibly leaves claims asserting a deliberate withholding of evidence without a category of constitutional redress. To the extent the dissent’s labeling is only case specific — that is, the invocation of Brady in this case referred only to the affirmative failure to disclose, not the deliberate suppression of evidence— the dissent, as noted, is flatly wrong.
Here, the jury rejected Drumgold’s “non-Brady” claim that Callahan intentionally framed him by obtaining false statements from Evans or otherwise man *45 ufacturing evidence. But it found that the exculpatory hotel evidence was “intentionally or recklessly withheld” — conduct that, if deliberate, was clearly unlawful at the time Callahan acted. The labeling of this failure-to-diselose claim as a Brady claim, or something else, makes no difference where, as a matter of substance, the claim plainly was understood by the parties, the judge, and the jury to embrace a culpable state of mind.
The dissent also argues that Callahan would be entitled to qualified immunity even if the deliberate suppression of evidence is covered by Drumgold’s Brady claim. This assertion, however, improperly relies on unsupported factual inferences from the jury’s verdict. The dissent states that the jury’s findings do not establish specific intent. We agree — but that non-finding does not earn Callahan immunity even assuming that specific intent were the only state of mind sufficient to support liability.[12]
The special verdict form in the 2009 trial asked whether Callahan “intentionally or recklessly withheld exculpatory evidence,” and the jury answered “yes” without specifying the state of mind it found. The dissent points out that the jury “made no express finding that Callahan acted with the purpose of suppressing such evidence.” Yet the jury also made no express finding that he did not.
Qualified immunity is an affirmative defense. We see no justification for granting immunity based on the supposition that the jury found the lesser state of mind, particularly when — in Callahan’s words — “intentional withholding of evidence ... [was] the core allegation at issue.” The dissent points to testimony that Callahan had told a prosecutor not involved in Drumgold’s case about placing Evans in a hotel and suggests that, as a result, the jury could not have found intentional suppression. It is the jury’s province, however, to weigh such evidence along with the other evidence presented at trial concerning Callahan’s state of mind. Because another trial is necessary, as we explain infra, the jury will again have the opportunity to do so.
C. The Scope of the 2009 Retrial
As noted above, the retrial jury found that Callahan withheld evidence that he provided Evans with free housing and $20. We have already explained that evidence of the latter benefit is not material. Hence, Callahan cannot be liable for withholding that evidence. Callahan now contends that the retrial jury should not have been permitted to reexamine the question of whether he withheld the housing evidence, since that question was resolved in his favor during the 2008 trial. He claims that there is, thus, no valid basis for his liability and that he is entitled to judgment as a matter of law. There is no dispute that this issue was preserved.
*46 Although much of the relevant background has already been laid out elsewhere in this opinion, we repeat portions of it here for clarity’s sake. In the 2008 trial, the jury determined that Callahan had not withheld evidence that he arranged free housing for Evans, but had withheld evidence that he gave Evans “substantial amounts of money.” The jury then hung on the question of whether Callahan’s misconduct had caused Drumgold’s conviction. After a mistrial was declared, Callahan moved for the entry of a final judgment as to, inter alia, the housing issue and simultaneously sought to restrict the scope of a retrial to the causation question on which the first jury deadlocked.
The district judge initially appeared receptive to this idea but ultimately rejected it. She reasoned that a retrial limited to causation was not feasible:
A second jury would obviously have to be instructed that Callahan had violated Drumgold’s civil rights by giving him “substantial amounts of money” and not disclosing it. The jury would be left with the ambiguity of what “substantial money” meant — an issue wholly unresolved in the first trial, notwithstanding the Court’s efforts to seek further clarification. And the only way to resolve that ambiguity would be to relate each side’s evidence concerning the treatment of Ricky Evans — why Ricky Evans’s testimony was significant to the Drumgold prosecution, that there had been no eyewitnesses to the murder that Drumgold was convicted of, ... the relationship between defendant Callahan and the witness, the steps that defendant Callahan allegedly took to secure Evans’s testimony (hotel rooms, meals, cash, etc.). In short, all aspects of Ricky Evans’s portion of this case would be involved.
As a result, the judge declined to enter a final judgment as to the housing issue and permitted the retrial jury to determine afresh what housing and money benefits, if any, Callahan gave Evans and failed to disclose.
The general practice after a mistrial is a full retrial of all issues in the case. See Nissho-Iwai Co. v. Occidental Crude Sales, 729 F.2d 1530, 1538 (5th Cir.1984). However, when some issues have been properly and conclusively resolved, there may be a partial retrial on the remaining issues if it “clearly appears” that they are “so distinct and separable from the others that a trial of [them] alone may be had without injustice.” Gasoline Prods. Co. v. Champlin Refining Co., 283 U.S. 494, 500, 51 S.Ct. 513, 75 L.Ed. 1188 (1931). This determination is distinctly within the ken of the trial judge. See Sprague v. Boston & Me. Corp., 769 F.2d 26, 28 (1st Cir.1985). Accordingly, our review of the judge’s decision as to the scope of the 2009 retrial is for abuse of discretion. See Winn v. Lafayette Town House, 839 F.2d 835, 837 (1st Cir.1988); Sprague, 769 F.2d at 28.
There were three possible ways to define the scope of the retrial. First, the judge could have confined the retrial to the causation inquiry that stymied the first jury. We agree with the judge that this was not a feasible option. The retrial jury could not have conducted a meaningful causation inquiry without rehearing the entirety of the 2008 trial evidence involving Evans in order to understand both the dynamics of his relationship with Callahan and his role in Drumgold’s criminal trial. Having heard that evidence, the retrial jury inevitably would have drawn its own conclusions as to the nature and amount of benefits that Callahan gave Evans, and would have been confused if prevented from returning a verdict reflecting those *47 conclusions. While juries are frequently instructed to consider evidence for one purpose and not others, see Fed.R.Evid. 105, we share the district judge’s concern that such an instruction would have posed an unacceptably high risk of confusion in this case, see Colonial Leasing of New England, Inc. v. Logistics Control Int’l, 770 F.2d 479, 481 (5th Cir.1985) (“[W]hen the issues subject to retrial are so interwoven with other issues in the case that they ‘cannot be submitted to the jury independently ... without confusion and uncertainty, which would amount to a denial of a fair trial,’ then it is proper to grant a new trial on all of the issues raised.” (quoting Gasoline Prods., 283 U.S. at 500, 51 S.Ct. 513)); Sears v. S. Pac. Co., 313 F.2d 498, 503 (9th Cir.1963).
The second route the judge could have taken was to allow the retrial jury to revisit whether Callahan withheld evidence that he gave money to Evans but not whether Callahan withheld evidence regarding the housing benefit. This approach, too, would have risked confusion since the evidence concerning the various benefits at issue here overlaps both topically and temporally. Moreover, it would have been unfair to Drumgold if he had to prove anew in the retrial that Callahan withheld evidence of a financial benefit to Evans, but Callahan was able to capitalize on the first jury’s finding that he did not withhold evidence of a housing benefit.
The third option, which the judge embraced, was a compromise solution. Permitting the retrial jury to reopen the housing issue clearly disadvantaged Callahan. However, reopening the financial benefit issue worked to Callahan’s advantage since it canceled out the first jury’s finding that he withheld evidence that he gave Evans “substantial amounts of money.” That opened the door for Callahan to persuade the retrial jury that the amount of money in question was only $20 — a sum we have now said was too low to support his liability.
We find no abuse of discretion in the judge’s ruling. The causation inquiry unresolved in the 2008 trial was not “so distinct and separable” from the housing issue that a partial retrial limited to causation plainly could be had without injustice. Gasoline Prods., 283 U.S. at 500, 51 S.Ct. 513. The judge’s solution to that problem was sensible and evenhanded.
The dissent’s contrary view fails to give deference to the district court’s carefully considered compromise and, hence, cannot be reconciled with the abuse of discretion standard. This is a difficult case, factually and legally. The 2008 trial spanned twenty-five days. The district court judge was deeply engaged with the issues over a lengthy period of time. Our colleague nonetheless challenges the district court’s judgment with a scattershot effort to depict its ruling as both legally and factually erroneous. The dissent’s analysis, however, reduces to a disagreement with the district court on a question that is uniquely within the district court’s expertise: whether this is a case where “the issues were too ‘interwoven’ to retry one issue separately.”
As we have explained, the district court had multiple paths to choose from. Its conclusion that the facts surrounding the provision of “substantial amounts of money” to Evans inevitably would implicate the entirety of Callahan’s relationship with Evans is supportable and, in the context of this case, does not require the extensive elaboration required by our colleague. The district court’s explanation was wholly adequate. Nor does the district court’s ruling conflict with Gasoline Products, where the Supreme Court considered the propriety of a court’s departure from the common law rule that an error with re *48 spect to one issue results in a new trial on all issues. See 283 U.S. at 497, 51 S.Ct. 513. The Supreme Court’s conclusion that the Seventh Amendment “does not compel a new trial of [all issues] even though another and separable issue must be tried again,” id. at 499, 51 S.Ct. 513, does not tilt the constitutional balance in favor of a limited retrial. In sum, we have no reason here — and no license — to preempt the district court’s choice on the contours of the new trial.
Hence, there was a valid basis for Callahan’s liability in the 2009 retrial.
D. The Jury Instructions
We have now established that Callahan is not entitled to judgment as a matter of law. We turn to his alternative argument that a new trial is necessary because the judge’s instructions on causation to the retrial jury were erroneous. We begin our discussion with the applicable legal framework and then quote the pertinent parts of the jury instructions before setting out the standard of review and moving to the merits of the issue.
1. The Legal Framework
Drumgold’s claims against Callahan were brought under 42 U.S.C. § 1983, the federal civil rights statute. To recover damages under § 1983, Drumgold must show more than a Brady violation. See Johnson v. Mahoney, 424 F.3d 83, 89 (1st Cir.2005); see also Rodriguez v. Woodall, 189 Fed.Appx. 522, 527 (7th Cir.2006) (“[A] constitutional violation, such as a Brady violation, is necessary, but more is needed.”). He also must demonstrate by a preponderance of the evidence a causal link between the Brady violation and his conviction. See Johnson, 424 F.3d at 89.
As a general rule, “[w]e employ common law tort principles when conducting inquiries into causation under § 1983.” Sanchez v. Pereira-Castillo, 590 F.3d 31, 50 (1st Cir.2009) (internal quotation marks omitted); see also Rodríguez-Cirilo v. García, 115 F.3d 50, 52 (1st Cir.1997) (“The issue of causation of damages in a section 1983 suit is based on basic notions of tort causation.”); Maldonado Santiago v. Velázquez García, 821 F.2d 822, 831 (1st Cir.1987) (“Section 1983 imposes a causation requirement similar to that of ordinary tort law.”). There are exceptions to this rule, though, and “[c]are must be taken in applying these principles to the § 1983 context.” Olsen v. Correiro, 189 F.3d 52, 66 n. 16 (1st Cir.1999); see also Coscia v. Town of Pembroke, Mass., 659 F.3d 37, 40 (1st Cir.2011); 1 Sheldon H. Nahmod, Civil Rights and Civil Liberties Litigation: The Law of Section 1983 § 3:106 (4th ed. 2011) (“[T]ort law purposes and interests are often different from § 1983 purposes and interests, and thus tort law concepts should not be blindly applied.”).
Under tort causation principles, an actor may be held liable for harm to another person if the actor’s misconduct was a factual cause of the harm, see Restatement (Third) of Torts § 26 (2010), and the harm resulted from the risks that made the conduct wrongful in the first place, meaning that it was a reasonably foreseeable consequence of the misconduct, see id. § 29. In turn, misconduct is considered a factual cause of harm in two mutually exclusive situations. The first is where the harm would not have occurred but for the misconduct. See id. § 26. This rule is sometimes called the “but for” causation principle. See id. § 26 cmt. b. The second scenario is where the harm was brought about concurrently by the misconduct and an unrelated force, each of which would have been sufficient by itself to trigger the harm. See id. § 27. In that circumstance, the actor’s misconduct was *49 not a necessary condition for the harm, since the harm would have occurred in its absence due to the concurrent force. See id. § 27 cmt. a. Nevertheless, the misconduct is regarded as a factual cause of the harm for policy reasons, since the actor should not escape liability merely because of the fortuitous operation of another force that also would have produced the harm on its own. See Dan B. Dobbs et al., The Law of Torts § 189 (2d ed. 2011) (“It would be a windfall [if the actor] were to escape liability for the harm merely because another [force] was also sufficient to cause the same harm.”); W. Page Keeton et al., Prosser and Keeton on Torts § 41 (5th ed.1984). We refer to this rule as the concurrent causation principle.
The materiality standard articulated in Brady and its progeny incorporates a version of the “but for” causation principle. Evidence that was withheld during a criminal trial is material only if there is a reasonable probability that its disclosure would have altered the trial’s outcome. See Strickler, 527 U.S. at 280, 119 S.Ct. 1936; Kyles, 514 U.S. at 434, 115 S.Ct. 1555; Bagley, 473 U.S. at 682, 105 S.Ct. 3375. Put another way, there must be a reasonable probability that the defendant would not have been convicted but for the wrongful withholding of exculpatory evidence. Hence, one cannot establish a Brady violation without showing to the requisite standard that the withholding of evidence was a necessary condition for the conviction. In the criminal context, this showing may result in a new trial or a judgment of acquittal.
To recover damages in a civil trial based on such a violation, however, a § 1983 plaintiff must demonstrate a stronger causal link than is inherent in Brady’s materiality standard. Having already shown a reasonable probability that he would not have been convicted but for the withholding of evidence, the plaintiff must then make the same showing by a preponderance of the evidence. In other words, the factual causation inquiry essentially replicates the materiality inquiry with a heightened burden of proof.[13]
Understood in this light, there is no place in the factual causation inquiry for the concurrent causation principle. That principle is incompatible with Brady’s materiality standard. Whereas under the concurrent causation principle misconduct can be a factual cause of harm even if the harm would have happened anyway, see Restatement (Third) of Torts § 27 (2010), withheld evidence is never material within the meaning of Brady if its disclosure would have made no difference, see United States v. Wall, 349 F.3d 18, 23 (1st Cir. 2003).
The second element of the traditional tort causation inquiry limits the scope of an actor’s liability to harm that results from the risks that made his conduct wrongful. See Restatement (Third) of Torts § 29 (2010). When material exculpatory evidence is withheld, the obvious risk is a tainted conviction. That risk is the reason for the Brady doctrine. Hence, once a Brady violation is established, there is no need to ask again whether the harm *50 (i.e., the conviction) was foreseeable. Once a Brady violation has been shown, the causation inquiry in a § 1983 damages suit is only a “but for” inquiry pursuant to the preponderance of the evidence standard.
2. The Jury Instructions
We now turn to the jury instructions given in the 2009 retrial. The judge first gave a materiality instruction that has not been challenged.[14] She then gave a lengthy causation instruction, informing the retrial jury that, if it found that Callahan withheld material exculpatory evidence, it had to decide whether his misconduct caused Drumgold’s conviction:
Now, I’ll address the question of cause, legal cause standard. If you determine that Officer Callahan committed a constitutional violation either by obtaining false statements or suppressing exculpatory evidence, and, again, material exculpatory evidence, you then need to address the relationship between the constitutional violations that you found and Shawn Drumgold’s conviction. That relationship is defined by the legal concept known as causation.
Causation has two elements: Factual cause and proximate cause. An act is a factual cause of an injury if it appears from the evidence that it was a substantial factor in bringing about the injury.[15] There may be a number of fac *51 tual causes of any particular injury; not everyone whose acts are factual causes of an injury is legally responsible. The law determines whether it is fair to hold someone responsible for an injury using the concept of proximate cause. An act is the proximate cause of an injury if the injury is a reasonably foreseeable consequence of the act.
This does not mean that the law recognizes only one legal cause of an injury or damage consisting of only one factor or thing or the conduct of one person, of only one person. On the contrary, many factors or things may operate at the same time either independently or together, to cause an injury. In that case, each may be a legal cause.
Let me give you an example of legal causation. Two fires are raging in the forest. One started when someone dropped a match on the ground. The two fires join together and burn down a barn. Dropping the match was a substantial factor in the harm of burning down the barn. The barn burning down was a reasonably probable result of dropping the match. In other words, the match legally caused the damage to the barn even if lightning itself would have burned it down.
Put in the context of this case, you should decide whether Officer Callahan’s wrongful conduct was a substantial factor in bringing about Shawn Drumgold’s conviction and whether it was reasonably foreseeable that a conviction would result from his conduct. Defendant Callahan’s, Officer Callahan’s, conduct need not be the only cause nor the latest or the nearest cause, it is sufficient if it concurs with some other cause acting at the same time which in combination with it contributed to Shawn Drumgold’s conviction.
Again, concerning legal cause, I remind you that the plaintiff has the burden of proving that any constitutional violations you identify were the cause of *52 the damages Plaintiff Drumgold has sustained. In other words, Mr. Drumgold must prove by a preponderance of the evidence that Officer Callahan’s actions in ... failing to disclose material exculpatory information were a substantial factor in causing Mr. Drumgold’s conviction and that the conviction was a reasonably foreseeable result of Officer Callahan’s actions. The evidence on which you’re to evaluate cause is the trial transcript which is now before you of the 1989 criminal trial.
3. The Standard of Review
Callahan objects to this instruction because it included the concurrent causation principle. Our standard of review depends on whether Callahan preserved this objection. See Colón-Millín v. Sears Roebuck de P.R., Inc., 455 F.3d 30, 40 (1st Cir.2006).
Federal Rule of Civil Procedure 51 provides a method for preserving objections to jury instructions. See Surprenant v. Rivas, 424 F.3d 5, 15 (1st Cir.2005). The judge must apprise the parties of the proposed instructions, consider requested instructions, and note objections before charging the jury. See Fed.R.Civ.P. 51(b); Booker v. Mass. Dep’t of Pub. Health, 612 F.3d 34, 40-41 (1st Cir.2010); Surprenant, 424 F.3d at 15. “An objection lodged at that time preserves the underlying issue for appeal.” Surprenant, 424 F.3d at 15; see also Fed.R.Civ.P. 51(c)(2)(A). If, however, the judge fails to inform a party of “an instruction or action on a request” before the jury is charged, the party may object “promptly after learning that the instruction or request will be, or has been, given or refused.” Fed.R.Civ.P. 51(c)(2)(B); see also Booker, 612 F.3d at 41. A party who objects to an instruction must “stat[e] distinctly the matter objected to and the grounds for the objection.” Fed.R.Civ.P. 51(c)(1).
Drumgold argues that Callahan not only failed to preserve his objection to the concurrent causation principle but invited any instructional error by advocating the indiscriminate application of traditional tort causation principles. See P.R. Hosp. Supply, Inc. v. Boston Scientific Corp., 426 F.3d 503, 505 (1st Cir.2005) (“In general, a party may not appeal from an error to which he contributed, either by failing to object or by affirmatively presenting to the court the wrong law.” (internal quotation marks omitted)); 9C Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2558 (3d ed. 2008) (“The so-called invited error rule ... prescribes that a party may not complain on appeal of errors that he himself invited.... Thus, a party who requests a jury instruction cannot complain if the instruction, or one substantially like it, is given by the trial judge.” (footnote omitted) (internal quotation marks omitted)).
We disagree. Before the retrial jury was charged, Callahan objected to the inclusion in the judge’s instructions of the example of two fires combining to burn down a barn. This example is a classic illustration of the concurrent causation principle, see Restatement (Second) of Torts § 432 cmt. d, illus. 4 (1965), and Callahan’s objection adequately alerted the judge to his concern that this principle was inapposite. Moreover, Callahan expressly requested a causation instruction in line with the “but for” causation principle:
The jury should be instructed that they are to consider the Evans issues within the context of the entire [1989 criminal trial], and that they may only find for Drumgold if they find that the conviction would not have occurred but for the alleged suppression of the Evans evidence.
*53 Viewed together with the objection to the illustration of the concurrent causation principle, this requested instruction signaled an attempt to confine the causation inquiry in the 2009 retrial to the “but for” causation principle. Accordingly, we treat Callahan’s objection as preserved. “We review de novo preserved claims of legal error in jury instructions, but we review for abuse of discretion claimed errors in instructions’ form or wording.” Uphoff Figueroa v. Alejandro, 597 F.3d 423, 434 (1st Cir.2010); see also Portugues-Santana v. Rekomdiv Int'l, 657 F.3d 56, 60 (1st Cir.2011). In doing so, we “look to the challenged instructions in relation to the charge as a whole, asking whether the charge in its entirety — and in the context of the evidence — presented the relevant issues to the jury fairly and adequately.” Sony BMG Music Entm’t v. Tenenbaum, 660 F.3d 487, 503 (1st Cir.2011) (internal quotation marks omitted). Even if we detect an error, a new trial is required only if the error was prejudicial. See id.
4. Analysis
The instructions given to the retrial jury appropriately presented materiality and causation as separate, sequential inquiries.[16] However, the judge made a fundamental error in describing the substance of the causation inquiry. She explained the concept of factual causation by reference to the “substantial factor” test and then fleshed out that test with a graphic illustration of the concurrent causation principle. Specifically, she used the example of two fires combining to destroy a barn to underscore the point that the fire ignited by the match could be considered “a substantial factor in the harm of burning down the barn ... even if lightning itself would have burned it down.” Insofar as that example implied that Callahan’s misconduct could be a factual cause of Drumgold’s conviction even if Drumgold would have been found guilty anyway, it was irreconcilable with Brady’s materiality standard and had no place in the causation inquiry.
The judge should have limited her discussion of factual causation to the “but for” causation principle. That is, she should have directed the jury to determine whether Drumgold had proven by a preponderance of the evidence that he would not have been convicted but for Callahan’s wrongful withholding of exculpatory evidence. Instead, the judge improperly invited the jury to analyze factual causation through the lens of the concurrent causation principle.[17]
We have no confidence that the retrial jury’s verdict was unaffected by the instructional error. Having linked the “substantial factor” test with the concurrent causation principle, the judge told the jury to “decide whether Officer Callahan’s wrongful conduct was a substantial factor in bringing about Shawn Drumgold’s conviction,” and reiterated at the close of the causation instruction that Drumgold had to “prove by a preponderance of the evidence that Officer Callahan’s actions in ... failing to disclose material exculpatory information were a substantial factor in causing [his] conviction.” This charge was nearly *54 the last thing the jury heard before it began its deliberations, and it diluted the standard of liability by making it possible for the jury to find that Callahan’s withholding of evidence was a factual cause of Drumgold’s constitutional injury (i.e., his wrongful conviction) even if that evidence was not the “but for” cause of Drumgold’s conviction — the materiality standard required by Brady. That illogical possibility could only have prejudiced Callahan.
It is our duty “to remain vigilant in policing the boundaries separating tort law from constitutional law,” Nix v. Franklin Cnty. Sch. Dist., 311 F.3d 1373, 1379 (11th Cir.2002), and to apply in the § 1983 context only those tort causation principles that are compatible with the underlying constitutional right, see Calero-Colón v. Betancourt-Lebron, 68 F.3d 1, 4 (1st Cir.1995) (“[T]he essential elements of actionable section 1983 claims derive first and foremost from the Constitution itself, not necessarily from the analogous common law tort.”). The causation instruction given in this case clashed with Brady’s materiality standard. A wrongful conviction based on the withholding of exculpatory evidence is not redressable under § 1983 without a showing, by a preponderance of the evidence, of “but for” causation. The erroneous instruction here permitted the jury to impose liability even in the absence of that causal nexus. Therefore, another retrial is necessary. See Allen v. Chance Mfg. Co., 873 F.2d 465, 469 (1st Cir.1989) (“An erroneous jury instruction necessitates a new trial ... if the error could have affected the result of the jury’s deliberations.”).
III.
We vacate the judgment in Drumgold’s favor and remand this case to the district court for a new trial consistent with this opinion. Each party is to bear its own costs.

So ordered.

. Drumgold's claims against Murphy were dismissed prior to trial. The claims against Roache and the City of Boston remain pending in the district court. The claims against Walsh went to trial together with those against Callahan, but the jury found that Walsh was not liable. Only Drumgold's claims against Callahan are relevant for the purposes of this appeal.

. We summarize the testimony of other prosecution witnesses below.

. Drumgold also alleged that Callahan withheld evidence regarding two other prosecution witnesses, Mary Alexander and Tracy Peaks. Those allegations were rejected by the jury in the 2008 civil trial and are not pertinent to this appeal.

. There is no indication in the record that Evans was ever criminally charged with perjury.

. The jury was also asked whether Drumgold had proven that Callahan intentionally or recklessly obtained false statements or manufactured evidence. The jury answered "no” to that question.

. Callahan's other arguments are that the judge erred in excluding from the 2009 retrial a package of forty-five investigative reports, instructing the retrial jury on the extent of damages for which he could be held liable, failing to remit a portion of the damages award, and awarding excessive attorneys’ fees.

. "Significant possibility” might be a better term than "reasonable probability” because the latter term "raises an unjustifiable risk of misleading courts into treating it as akin to the more demanding standard, ‘more likely than not.’” Strickler, 527 U.S. at 298, 119 S.Ct. 1936 (Souter, J., concurring in part and dissenting in part). Nevertheless, "reasonable probability” remains the proper formulation.

. The district judge at one point instructed the retrial jury that it could hold Callahan liable only if it found that he “knowingly and deliberately” withheld evidence, but she also repeatedly explained that Drumgold had to prove that Callahan acted "intentionally or recklessly,” and the special verdict form used in the retrial reflected that formulation.

. Although the official first day of summer usually falls on June 21, we understand Evans to mean that he moved into the hotel on a warm, summer-like evening.

. We do not mean to suggest that a law enforcement officer can be liable today in a damages action under 42 U.S.C. § 1983 only for deliberately suppressing evidence. Nondisclosure with a less culpable state of mind might suffice. See Haley, 657 F.3d at 47 (assuming without deciding that "no-fault nondisclosure constitutes a viable claim of breach”). This is a difficult question that has engendered a range of views. See, e.g., Tennison v. City and Cnty. of San Francisco, 570 F.3d 1078, 1089 (9th Cir.2009) ("[A] § 1983 plaintiff must show that police officers acted with deliberate indifference to or reckless disregard for an accused’s rights or for the truth in withholding evidence from prosecutors.”); Porter, 483 F.3d at 1306 (”[T]he no-fault standard of care Brady imposes ... in the criminal or habeas context has no place in a § 1983 damages action against a law enforcement official in which the plaintiff alleges a violation of due process.”); Villasana v. Wilhoit, 368 F.3d 976, 980 (8th Cir.2004) (”[T]he recovery of § 1983 damages requires proof that a law enforcement officer ... intended to deprive the defendant of a fair trial.”). We do not reach this question here. Our holding is limited to the law as it was clearly established in 1989, when Callahan engaged in the conduct at issue here.

. Indeed, the court instructed the jury that "[w]ithholding material exculpatory evidence by accident or mistake does not give rise to liability under the Federal Civil Rights Act. As I said, the conduct must be either intentional or reckless.”

. In his Memorandum of Law in Support of His Request for Jury Instructions, Callahan stated:
The jury should be instructed that in order to find against Callahan, they must find that his omission of material exculpatory evidence must have been essentially deliberate. Omission of material exculpatory evidence by accident or mistake or through some ordinary level of negligence or carelessness does not give rise to liability under the statute; rather, the omission must have been either intentional or reckless, which the law treats as equivalent of intentional.
Memorandum at 8 (emphasis added); see also, e.g., Tennison, 570 F.3d at 1088 (stating that a § 1983 plaintiff alleging a due process claim against a police officer for withholding evidence must show "deliberate indifference to or reckless disregard for an accused’s rights or for the truth in withholding evidence from prosecutors” (emphasis added)).

. There is some logical appeal to bypassing the materiality inquiry and simply requiring the plaintiff to prove from the outset by a preponderance of the evidence that he would not have been convicted but for the withholding of evidence. Nevertheless, materiality and causation are in fact discrete inquiries and should be considered separately. The threshold question in a § 1983 suit is whether there has been a violation of a federally secured right. See Baker v. McCollan, 443 U.S. 137, 140, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979). Materiality properly is a component of that question. The causation inquiry begins only after a violation has been established. See Sanchez, 590 F.3d at 41.

. The materiality instruction was as follows:
Exculpatory evidence is material when it is of a type that could undermine confidence in the outcome of a trial. It would include evidence that has the potential to alter a jury's assessment of the credibility of a significant government witness.
In determining what is material, the question is not whether a defendant would more likely than not receive a different verdict if the evidence had been disclosed. The question is whether without the evidence he would receive a fair trial, understood as a trial resulting in a verdict worthy of confidence.
And in considering whether a verdict worthy of confidence would result, you have to consider the setting.... In [the 1989 criminal trial], the burden of proof was beyond a reasonable doubt. The [prosecution] was required to convince a unanimous jury beyond a reasonable doubt to sustain a conviction against Mr. Drumgold. Thus, one way of understanding materiality is to consider whether the undisclosed evidence would have created a reasonable doubt of the defendant’s guilt.
This instruction omitted the statement that Drumgold had to show a reasonable probability that he would not have been convicted but for Callahan's withholding of evidence. The instruction noted that “evidence is material when it is of a type that could undermine confidence in the outcome of a trial” and that "the question is not whether a defendant would more likely than not receive a different verdict if the evidence had been disclosed.” Those are important glosses on Brady’s materiality standard, but the centerpiece of the standard is a reasonable probability of a different result. See Kyles, 514 U.S. at 434, 115 S.Ct. 1555. The absence of that formulation from the instruction detracted from the causal showing at the heart of the materiality inquiry. Nevertheless, there is no challenge to the materiality instruction on appeal, and this omission is not a factor in our decision.

. As explained above, an actor is liable in tort for harm to another person if the actor’s misconduct was a factual cause of the harm, see Restatement (Third) of Torts § 26 (2010), and the harm resulted from the risks that made the conduct wrongful in the first place, meaning that it was a reasonably foreseeable consequence of the misconduct, see id. § 29. These elements traditionally have been referred to as “factual causation” and "proximate causation,” but the terms for these two concepts sometimes have been confused, as have the concepts themselves. See Rodríguez-Cirilo, 115 F.3d at 54 (Campbell, J., concurring) (noting confusion); Fedorczyk v. Caribbean Cruise Lines, Ltd., 82 F.3d 69, 73 (3d Cir.1996) (same); Dan B. Dobbs et al., The Law of Tons § 185 (2d ed. 2011) ("Courts often lump these two distinct issues together under the rubric of 'proximate cause.’ ”). One particular source of confusion has been the “substantial factor” test used in many *51 jurisdictions, under which an actor may be held liable for harm if his misconduct was a substantial factor in bringing about the harm and no rule of law relieves the actor from liability because of the manner in which the harm occurred. See Restatement (Second) of Torts § 431 (1965). Although this test was intended as the "routine standard” for factual causation, Restatement (Third) of Torts § 26 cmt. j (2010), it commonly has been misunderstood to address proximate causation, as well, see, e.g., Clement v. United States, 980 F.2d 48, 53 n. 13 (1st Cir.1992); Richard W. Wright, Causation in Tort Law, 73 Cal. L.Rev. 1735, 1782 (1985).
The modern trend, endorsed by the American Law Institute (“ALI”), is to retain the term "factual causation” but abandon the "substantial factor” test, see Restatement (Third) of Torts § 26 cmt. j (2010), and to replace the problematic term "proximate causation” with “scope of liability,” see id. Ch. 6, Special Note on Proximate Cause (2010), and thereby refocus the second component of the causation inquiry on whether the harm in question was among “those harms that result from the risks that made the actor's conduct tortious,” id. § 29. In addition, although the ALI for many years employed the umbrella term “legal cause” to encompass both elements of the causation inquiry, see Restatement (Second) of Torts § 430 (1965), it recently retired that term in an effort to emphasize that the two elements are distinct, see Restatement (Third) of Torts Ch. 6, Special Note on Proximate Cause (2010).
This trend has been embraced by a number of courts, see, e.g., June v. Union Carbide Corp., 577 F.3d 1234, 1240 (10th Cir.2009); Thompson v. Kaczinski, 774 N.W.2d 829, 837 (Iowa 2009), and, properly understood, merely represents a shift in terminology, see Restatement (Third) of Torts § 29 cmt. j (2010). The contours of the causation inquiry are unchanged.
We use the new terminology proposed by the ALI throughout this opinion to help us explain the error in the district judge’s causation instruction. It is premature to adopt the new terminology generally. The district judge used the traditional terminology.

. The special verdict form used in the retrial likewise presented materiality and causation as separate questions, directing the jury to decide first whether "the evidence withheld by Defendant Callahan was material” and then, if so, whether Callahan’s withholding of that evidence "was a legal cause of Mr. Drumgold’s conviction.”

. In fairness to the district judge, we note that the issue of causation in civil trials seeking damages for Brady violations has not been well-developed. In that legal environment, it would be easy to make a mistake.