NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 16a0211n.06

Case Nos. 14-3905/3906

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

**FILED**
Apr 15, 2016
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| ALEX LEFEVER (14-3906); VIRGINIA LEFEVER (14-3905), | ) ) ) | |
| Plaintiffs-Appellants, | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR |
| v. | ) ) | THE SOUTHERN DISTRICT OF OHIO |
| JAMES FERGUSON, et al., | ) ) | |
| Defendants-Appellees. | ) | |

BEFORE: DAUGHTREY, COOK, and WHITE, Circuit Judges.

COOK, Circuit Judge.   More than 20 years after convicting Virginia LeFever of murdering her estranged husband, William LeFever, an Ohio trial court granted a new trial upon learning that the toxicologist whose forensic testimony implicated Virginia pleaded no contest to falsification charges for lying about his graduation date in prior proceedings.  County authorities have since released Virginia from custody and declined to retry her, dismissing the underlying indictment without prejudice.

Virginia and her son Alex both sued various county officials and the relevant municipalities under 42 U.S.C. § 1983.  Pertinent to this appeal, Virginia asserts concealment of impeachment and exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and challenges the district court's grants of qualified immunity on those claims to the former

chief toxicologist of the Franklin County Coroner's Office James Ferguson, former Licking County coroner Dr. Robert Raker, and City of Newark detective Ken Ballantine. Alex alleges that the defendants violated his right to familial integrity by wrongfully convicting his mother and contests the district court's orders dismissing and granting summary judgment on his familial-integrity claim.

For the following reasons, we AFFIRM the district court's grants of summary judgment on qualified-immunity grounds to Ferguson, Dr. Raker, and Ballantine in Virginia's case and its denial of Virginia's summary judgment motion against Ferguson, as well as AFFIRM the dismissal of, and grants of summary judgment on, Alex's claim.

## I. BACKGROUND

### A. Ohio's Murder Case Against Virginia

Shortly before Virginia's and William's final divorce hearing, William visited the family home for dinner. After dinner and into the following day he displayed increasingly erratic and combative behavior. Virginia eventually called paramedics claiming to have discovered several pills missing from an old Elavil (antidepressant) prescription bottle. Nonetheless, William died. Before he died of cardio-pulmonary arrest, however, he told a hospital nurse competing stories regarding the pills: (1) that he "couldn't cope any more" and took them, and (2) that Virginia forced them on him.

The Licking County Coroner's Office, led by Dr. Raker, investigated the alleged overdose and upon finding numerous bruises on the corpse—unusual for an overdose suicide—contacted Detective Ballantine. Dr. Raker ordered a forensic autopsy, which required transferring William's corpse from Licking County to the Franklin County Coroner's Office (FCCO).

Franklin County's Chief of Forensic Pathology, Dr. Patrick Fardal, performed this autopsy and Ferguson performed a toxicology analysis. Thereafter, FCCO returned William's body to Dr. Raker's custody. The initial toxicology results led Ferguson to suspect that Virginia injected William with amitriptyline, a key ingredient in the antidepressant Elavil, so Ferguson requested that Dr. Raker examine William's body for intramuscular injection sites. Dr. Raker found one suspicious injection site on William's left buttock and sent Ferguson a biopsy from that site for toxicology testing. Tests revealed amitriptyline in the suspicious injection site and in William's lower colon, indicative of both intramuscular injection and rectal administration. Ferguson also discovered two types of strychnine-poisoned rodent bait in William's colon. At the conclusion of the autopsy and toxicology analysis, FCCO issued a report concluding that William died from exposure to amitriptyline.

The Newark Police Department's investigation uncovered hypodermic needles and syringes, rodent-killing poison, and charred remains from "Smoke'em" fumigation pesticides in Virginia's home. Interviews with LeFever's young children revealed that the day before William died, Virginia lit one of the "Smoke'em" pesticides in a bedroom while he slept and then left with the children and family cat. Relying on the physical evidence, witness statements, and autopsy report, the Licking County Prosecutor obtained an indictment from a grand jury in November 1988.

Before Virginia's trial, Ferguson and Director of Forensic Toxicology Dr. Daniel Couri (also associated with FCCO) issued a supplemental toxicology report (Supplemental Report) noting that arsenic and sulfur oxides, the primary gas generated by "Smoke'em" pesticides, contributed to William's death. The Supplemental Report found arsenic in William's hair, nails, kidney, heart, and liver.

Ultimately, the Supplemental Report concluded that William "died as a consequence of multiple administration of toxic agents," with amitriptyline poisoning as the "immediate cause." In response, Dr. Raker issued a supplemental death certificate listing acute amitriptyline and nortriptyline poisoning by intramuscular injection as the primary cause of William's death, now classified as a homicide. It further recorded acute poisoning by sulfur oxide, arsenic, and strychnine via pulmonary and rectal routes, as well as chronic arsenic poisoning via an oral route as other significant conditions.

Following a bench trial, an Ohio court convicted Virginia of murder. She spent more than 20 years in prison until revelations about Ferguson's misrepresented graduation date led the court to order a new trial in November 2010. In granting the new trial, the court doubted Virginia's innocence, but nonetheless found that Ferguson's dishonesty regarding his graduation date resulted in an unfair trial.

*B. Virginia's § 1983 Suit*

After the Ohio trial court ordered her release from prison, Virginia sued various defendants, including Ferguson, Dr. Raker, and Ballantine, asserting claims under federal and state law. Those claims include § 1983 claims for failure to disclose evidence—evidence that Virginia now sees as valuable for impeachment and thus exculpatory under *Brady*—and for fabrication of evidence.

Ferguson, Dr. Raker, and Ballantine each moved for summary judgment. Virginia moved for partial summary judgment against Ferguson on her *Brady* claim.

In resolving these motions, the district court first denied Ferguson absolute and qualified immunity on Virginia's fabrication-of-evidence claim, allowing it to proceed. Second, it denied Virginia's motion for partial summary judgment against Ferguson on her *Brady* claim. Third, it

granted qualified immunity to Ferguson and Dr. Raker on Virginia's *Brady* claims, finding neither had a clearly established duty to disclose the evidence Virginia claims to have been exculpatory or impeaching. Fourth, it granted Ballantine qualified immunity on Virginia's *Brady* claims, discerning no constitutional violation.

Ferguson immediately appealed the denial of absolute immunity. This court reversed, granting Ferguson absolute testimonial immunity on Virginia's fabrication-of-evidence claim. *LeFever v. Ferguson*, 567 F. App'x 426, 431 (6th Cir. 2014).

Virginia now appeals the district court's grants of summary judgment on qualified-immunity grounds to Ferguson, Dr. Raker, and Ballantine on her claims for failure to disclose the evidence she claims to be impeachment/exculpatory under *Brady*, as well as the denial of her motion for summary judgment against Ferguson on that claim.

*C. Alex's § 1983 Suit*

Following Virginia's release, her son Alex also sued Ferguson, Dr. Raker, Ballantine, and Bill Hatfield, another City of Newark police officer, alleging that their fabricated murder theories and failure to disclose exculpatory evidence violated Alex's substantive due process right to familial integrity. Alex also asserted that Licking County's, Franklin County's, and the City of Newark's policies and practices led to the violation of this right. Dr. Raker and Licking County moved to dismiss Alex's claim, and the other defendants moved for summary judgment.

Ruling on Dr. Raker's and Licking County's motion, the district court dismissed Alex's claim for the violation of his right to familial integrity, finding that any injury he experienced flowed from the constitutional violations suffered by Virginia, and Sixth Circuit precedent foreclosed § 1983 actions for harm suffered by others. Granting summary judgment to the other defendants on this claim logically followed. Alex appeals.

## II. ANALYSIS

*A. Virginia's* Brady *Claims*

We review the district court's grant of summary judgment de novo, affirming if the evidence demonstrates no genuine issue as to any material fact and, construing the evidence and reasonable inferences in favor of the non-movant, the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Wesley v. Campbell*, 779 F.3d 421, 434–35 (6th Cir. 2015).

In evaluating claims for qualified immunity, this court considers whether there was (1) a constitutional violation, (2) of a clearly established right, and (3) whether the plaintiff has alleged facts supported by evidence showing that an official engaged in objectively unreasonable conduct. *Moldowan v. City of Warren*, 578 F.3d 351, 375 (6th Cir. 2009) (quoting *Williams* v. *Mehra*, 186 F.3d 685, 691 (6th Cir. 1999) (en banc)). Once officials raise the qualified-immunity defense, the plaintiff bears the burden to "demonstrate that the officials are not entitled to qualified immunity." *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006).

To establish a violation of her constitutional rights under *Brady*, Virginia must prove that a defendant withheld favorable exculpatory or impeachment evidence; the state suppressed that evidence; and the suppression resulted in prejudice, meaning that the suppressed evidence was material. *Robinson v. Mills*, 592 F.3d 730, 735 (6th Cir. 2010). Material evidence creates a "reasonable probability that, had the evidence been disclosed, the result of the proceeding would

have been different," *Cone v. Bell*, 556 U.S. 449, 470 (2009), meaning nondisclosure "undermine[s] confidence in the verdict," *id.* (quoting *Kyles v. Whitley*, 514 U.S. 419, 435 (1995)). We consider evidence alleged to violate *Brady* collectively to determine materiality. *Kyles*, 514 U.S. at 436. And when determining whether undisclosed "'information [is] material and therefore prejudicial,' a reviewing court considers 'it in light of the evidence available for trial that supports the . . . conviction.'" *Jalowiec v. Bradshaw*, 657 F.3d 293, 305 (6th Cir. 2011) (quoting *Jells v. Mitchell*, 538 F.3d 478, 502 (6th Cir. 2008)).

We decide Virginia's case on grounds other than those relied upon by the district court. The district court used the clearly-established prong to determine that Ferguson and Dr. Raker enjoyed qualified immunity. By contrast, we determine that neither Ferguson nor Dr. Raker violated Virginia's constitutional rights under *Brady*. Because Virginia briefed the issue of whether the evidence Ferguson and Dr. Raker failed to disclose violated those rights, we may affirm the grant of summary judgment on this alternate ground. *See Thornton v. Fed. Express Corp.*, 530 F.3d 451, 456 n.2 (6th Cir. 2008).

### 1. Did Ferguson Violate Virginia's Rights Under *Brady*?

Virginia contends that Ferguson's failure to disclose three evidentiary matters would have altered her trial in her favor: (1) lies told about his graduation date at her trial and others, (2) his "true conclusions about arsenic," and (3) a fanciful manuscript he authored about Virginia's case. None thwart qualified immunity.

#### a. Ferguson's Graduation-Date Lie

Virginia attempts to show that Ferguson withheld material evidence by pointing to his lie—told at her trial and previous trials—that he graduated from The Ohio State University in

1972 when he in fact graduated in 1987. She argues that had Ferguson disclosed this lie to her before trial, including that he had testified falsely in other trials, she could have destroyed his credibility, thereby undermining confidence in the outcome of her trial. But Virginia overlooks several key considerations.

First, Ferguson told the *same* lie at every trial: the date he graduated. And as he reminds, absolute immunity shields his testimony at Virginia's trial—even lies. *Rehberg v. Paulk*, 132 S. Ct. 1497, 1505 (2012); *Briscoe v. LaHue*, 460 U.S. 325, 329–31, 341–45 (1983). Virginia thus tries to bootstrap Ferguson's failure to disclose his lies at *other* trials into a *Brady* claim for failure to disclose material impeachment evidence at *her* trial. But ultimately her claim relies on the lie told at her trial—one that was immunized.

Second, even had Virginia known that Ferguson lied at previous trials about his graduation date, those lies provide little impeachment value given Ferguson's otherwise strong credentials as a toxicology expert at the time of Virginia's trial. For example, Ferguson had been performing chemical and toxicology analysis and testifying as an expert witness for over 20 years by the time of Virginia's trial in February 1990. Additionally, at the time of Virginia's trial Ferguson had obtained his undergraduate degree, even though forensic toxicologists need not possess a college degree to work in Ohio. Exposing the lie he told about the year he graduated, therefore, would have made little difference in assessing his credibility.

Third, Ferguson's lie about his graduation date leaves unscathed the scientific analysis underlying his conclusions. Had Virginia tried to impeach Ferguson for lying about his graduation date, his analysis of facts and data would have remained unimpeached. Indeed, Virginia makes no suggestion that Ferguson performed invalid or erroneous scientific testing while working on her case.

Virginia points us to *Westerfield v. United States*, 483 F. App'x 950, 952, 955 (6th Cir. 2012), in which we found a detective's failure to disclose that he perjured himself—at the criminal trial of the plaintiff's co-defendant—material under *Brady* when the detective's testimony at the plaintiff's criminal trial provided the only evidence of an element necessary to convict the plaintiff. Relying on *Westerfield*, Virginia argues that Ferguson's perjury must be material evidence under *Brady*. But here, despite Ferguson's graduation-date lie, ample evidence remained to conclude that Virginia poisoned William and, therefore, to support her murder conviction. For example, Ferguson's lie in no way undermines the underlying data or toxicology analysis that he performed to conclude how various toxins entered William's body. As another example, Ferguson possessed the credentials to interpret the data and to perform the various analyses that he used to reach the conclusions to which he testified. Because Ferguson's graduation-date lie leaves confidence in the outcome of Virginia's criminal trial intact, nondisclosure of that evidence caused Virginia no prejudice and thus constitutes no *Brady* violation.

### b. Ferguson's Arsenic Conclusion

Next, Virginia argues that Ferguson should have disclosed "[h]is true conclusion[] about arsenic": that he could not identify the route of entry to a reasonable degree of scientific certainty. She contrasts this "true conclusion"—testified to at Ferguson's deposition for this case—with his trial testimony that acute arsenic poisoning was administered rectally. But we already determined that he possesses absolute immunity for his criminal-trial testimony, including any lies, regarding the administration of arsenic in Virginia's case. *LeFever*, 567 F. App'x at 431. This immunity absolves him from Virginia's claim for the nondisclosure of his "true conclusion" about arsenic. *See Imbler v. Pachtman*, 424 U.S. 409, 431 n.34 (1976)

(finding that absolute immunity prevents liability under *Brady* for suppressing the "evidence upon which the knowledge of perjury rested").

In any event, Virginia fails to show any discrepancy in the opinion he offered at her trial and the opinion he held at the time of his deposition in this case. At Virginia's criminal trial, Ferguson testified to a reasonable degree of scientific certainty about *acute* arsenic poisoning, opining that it "was administered rectally." At that trial he also testified that he held no opinion on how the *chronic* arsenic poisoning was administered. At his deposition in this case—taken 22 years after Virginia's trial—however, when asked the unqualified question "how the *arsenic* got into [William's] body," Ferguson testified that he reached no opinion. His deposition taken for this case included only questions on *arsenic generally*, not on *acute* or *chronic* arsenic poisoning specifically. Virginia thus shows no contradiction between Ferguson's trial and deposition testimony.

In addition, Virginia also fails to undermine the validity of the evidence supporting Ferguson's acute-arsenic opinion. At trial, Ferguson testified that acute poisoning resulted from the arsenic found in William's colon and that rectal administration readily explained the presence of that arsenic. Virginia's version of Ferguson's "true conclusion" regarding *general* arsenic administration contradicts none of his testimony regarding the evidence supporting his *acute*-arsenic rectal-administration opinion, namely the high levels of arsenic in William's dried feces and the lack of pathological signs consistent with an oral dose. Ferguson's "true conclusion" regarding the route of arsenic administration, therefore, provides neither impeachment nor exculpatory value and fails to undermine confidence in the outcome of Virginia's criminal trial.

### c. Ferguson's Fanciful Manuscript

Finally, Virginia argues that Ferguson should have disclosed the manuscript he authored before her trial detailing the work he did on her case because it reveals his bias against her. But Ferguson's manuscript was not evidence. Indeed, he testified that he wrote the manuscript for personal interest, not for use at Virginia's trial. At most the manuscript shows that Ferguson believed Virginia to be guilty, but a prosecution witness believing the defendant guilty is hardly unusual or inappropriate.

Even assuming that Virginia could have introduced the manuscript to impeach Ferguson at trial, she presents no argument how the manuscript would have accomplished that goal. The district court considered the manuscript's impeachment value when deciding Ballantine's summary judgment motion and highlighted that the manuscript in no way undermines the science behind Ferguson's testimony. Indeed, in the manuscript Ferguson stated his testimony at trial "will be restricted to expounding on the toxicological facts" but "[t]he courts will decide . . . who[m] [to] believe[]." And Ferguson never tried to profit from the manuscript in any way. Virginia simply fails to show how she could have used this manuscript to impeach Ferguson, much less impeach him so thoroughly as to undermine confidence in the outcome of her trial.

### d. The Three Together Fail to Undermine Confidence in Trial Fairness

Virginia argues that, taken together, these three undisclosed evidentiary matters undermine confidence in her trial's outcome. She points to the trial judge's worry that Ferguson's testimony cemented the case. But the trial judge doubted her innocence even as he ordered her release and for good reason. For one, none of the "undisclosed" evidentiary matters attack the underlying facts or science as synthesized, which supported the state's murder theory and contradicted Virginia's suicide theory. For another, none of this "evidence" attacks the

27 other witnesses offered by the prosecution—and over 50 total—at her trial. Individually none of the evidentiary matters Virginia identifies have sufficient impeachment value to undermine confidence in the outcome of her trial. Considering this evidence cumulatively yields the same result.

Even viewing the evidence in her favor, Virginia fails to carry her burden of showing that the evidence Ferguson withheld undermines confidence in the outcome of her trial. She thus fails to show that Ferguson violated her constitutional right to material impeachment or exculpatory evidence under *Brady*. The district court correctly determined that qualified immunity shields Ferguson and granted summary judgment to him on Virginia's *Brady* claim.

**2. Did Dr. Raker Violate Virginia's Rights Under *Brady*?**

Virginia next argues that Dr. Raker violated her constitutional right to material exculpatory or impeachment evidence by failing to disclose: (1) his "true opinions" on how arsenic and strychnine entered William's body, and (2) the manuscript Ferguson authored.

Both of Dr. Raker's allegedly "true opinions" about how arsenic and strychnine entered William's body deviate from the death certificate. Virginia gleans Dr. Raker's "true opinion" for arsenic entry to be the oral route, compared with the death certificate he signed targeting "acute [arsenic] poisoning by pulmonary and rectal" routes and "chronic [arsenic] poisoning by oral route." And though the death certificate lists a rectal route of entry for strychnine, Dr. Raker's "true opinion" was that he held no opinion on strychnine entry. Virginia asserts that if disclosed, these "true opinions" may have prompted the trial judge to reach a different verdict because they undermine the prosecution's theory on how those toxins entered William's body, as well as damage Dr. Raker's and Ferguson's credibility. But three considerations undercut Virginia's position.

First, no evidence contradicts the facts supporting the rectal-administration-of-arsenic theory—namely, the high levels of arsenic in William's dried feces and an absence of "any pathologic sign of gastric erosion . . . consistent with an oral dose." Similarly, Dr. Raker's "true opinion" about strychnine fails to negate the fact that Ferguson found "two types of strychnine poisoned rodent bait in [William's] colon."

Second, Dr. Raker undertook no independent toxicology analysis, relying instead on Ferguson's work to determine what to report on the death certificate. Dr. Raker's amending the death certificate to reflect the conclusions that Ferguson reached by performing the toxicology analysis thus leaves Dr. Raker's credibility unimpeached.

Third, attacking the routes of entry of arsenic and strychnine with Dr. Raker's "true opinions" still leaves unchallenged the amitriptyline-by-intramuscular-injection as the cause of death. So assaulting the arsenic and strychnine theories fails to undermine the main theory of how William died.

Virginia also restates her argument about Ferguson's manuscript because Dr. Raker saw a copy. But as previously discussed, Ferguson's manuscript provides negligible impeachment value.

Considering the evidence collectively and in her favor, Virginia fails to show that the evidence Dr. Raker allegedly should have disclosed undermines confidence in the outcome of her trial. The district court properly granted qualified immunity to Dr. Raker on Virginia's claim that he failed to disclose material exculpatory or impeachment evidence under *Brady*.

**3. Did Ballantine Violate Virginia's Rights Under *Brady*?**

Finally, Virginia asserts a *Brady* claim against Ballantine. Unlike with Ferguson and Dr. Raker, the district court passed on the materiality of the exculpatory or impeachment evidence on

Ballantine's motion for summary judgment and determined that the evidence Ballantine allegedly withheld constituted no *Brady* violation.

Virginia points to three evidentiary matters that she believes may have altered the outcome of her trial had Ballantine disclosed them, therefore rendering him liable under *Brady*. She argues that he should have disclosed: (1) a witness statement by Virginia's former co-worker Susan Hamann regarding syringes; (2) notes from his conversation with FCCO Pathologist Dr. Fardal in which Dr. Fardal "could not say whether [the strychnine in William] came by mouth or anus;" and (3) Ferguson's fanciful manuscript.

Beginning with Hamann's unrevealed witness statement, Virginia alleges that it listed the lot numbers of syringes from Hamann's and Virginia's workplace, and speculates that this statement "would have shown that the syringes found in the LeFever house were not the same ones stocked where Virginia worked." But as the district court observed, even if this statement exists and even if it shows that the syringes found at the LeFever house came from somewhere other than Virginia's work, that fact "is not exculpatory." Connecting Virginia to syringes from her workplace would have been strong inculpatory evidence. That Virginia may not have had syringes from her work shows nothing.

Next, Ballantine's notes from his conversation with Dr. Fardal also provide no value to Virginia. As with Dr. Raker, Dr. Fardal performed no independent toxicology analysis, instead relying on Ferguson's work. The district court thus reasoned that Dr. Fardal's lack of opinion as to whether strychnine entered William's body orally or rectally is hardly surprising—he performed no analysis allowing him to form such an opinion. In any event, Dr. Fardal offered no opinion at trial on how strychnine entered William's body. Also, Dr. Fardal's non-opinion on strychnine has no bearing on the state's primary theory of death: an intramuscular injection of

amitriptyline. Accordingly, Ballantine's notes prove impotent for impeachment, as does Ferguson's manuscript, as previously explained.

Taken together, the evidence Virginia claims Ballantine should have disclosed provides neither impeachment nor exculpatory value. Considering the evidence in Virginia's favor, she fails to meet her burden of showing that its nondisclosure undermines confidence in the outcome of her criminal trial. The district court properly granted qualified immunity, and thus summary judgment, to Ballantine on Virginia's *Brady* claim.

*B. Alex's Claim for the Violation of His Right to Familial Integrity*

**1. Procedural Posture and Standard of Review**

On appeal, Alex challenges the district court's grant of Dr. Raker's motion to dismiss his substantive due process claim brought under § 1983 for the deprivation of his right to familial integrity, as well as the district court's attendant grants of summary judgment to Ferguson and Ballantine on that claim.[1]

We review the dismissal of a plaintiff's claim under Rule 12(b)(6) de novo, *Kolley v. Adult Protective Servs.*, 725 F.3d 581, 585 (6th Cir. 2013), to determine whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible

---

[1]Alex also asks the court to reverse the district court's judgments in favor of the two county defendants, but these issues are not properly before the court. Under Rule 3(c)(1)(B) of the Federal Rules of Appellate Procedure, the notice of appeal must "designate the judgment, order, or part thereof being appealed." Here, the notice of appeal designated judgments in favor of Ferguson, Dr. Raker, and Ballantine. Alex did not name the county defendants or cite the orders granting them judgment on his family-integrity claim, and counsel for the county defendants accordingly did not enter appearances or brief the appeal. Because "Rule 3's dictates are jurisdictional in nature," Alex's "noncompliance is fatal." *Smith v. Barry*, 502 U.S. 244, 248 (1992); *see also JGR, Inc. v. Thomasville Furniture Indus., Inc.*, 550 F.3d 529, 532 (6th Cir. 2008) ("[A] court of appeals has jurisdiction only over the areas of a judgment specified in the notice of appeal as being appealed."); *United States v. Glover*, 242 F.3d 333, 335 (6th Cir. 2001) ("Congress has limited this Court's appellate review to issues designated in the notice of appeal.").

on its face,'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Because no defendant disputes acting under the color of state law when engaging in the conduct Alex complains of, we consider whether any conduct deprived Alex of his right to familial integrity. *See Ziegler v. Aukerman*, 512 F.3d 777, 781 (6th Cir. 2008).

### 2. Alex's Right to Familial Integrity

Alex implores this court to follow *Smith v. City of Fontana*, 818 F.2d 1411, 1418 (9th Cir. 1987), *overruled on other grounds by Hodgers-Durgin v. de la Vina*, 199 F.3d 1037 (9th Cir. 1999), which allowed children of a parent killed by the police to pursue claims for losses of familial companionship and society. Because the defendants violated his personally held right to familial integrity, Alex argues, the district court erred by finding his claim derivative of his mother's and dismissing it.

But *Smith* is at odds with our precedents. Claims under § 1983 are personal to the party injured by a constitutional violation. *See Jaco v. Bloechle*, 739 F.2d 239, 241 (6th Cir. 1984). Indeed, we have repeatedly found that § 1983 provides no relief for injuries collateral to the violation of another person's constitutional right. *Claybrook v. Birchwell*, 199 F.3d 350, 357 (6th Cir. 2000) ("[O]nly the purported victim, or his estate's representative(s), may prosecute a section 1983 claim; conversely, no cause of action may lie under section 1983 for emotional distress, loss of a loved one, or any other consequent collateral injuries allegedly suffered personally by the victim's family members."); *see also Foos v. City of Delaware*, 492 F. App'x 582, 592–93 (6th Cir. 2012). In fact, we juxtaposed the Ninth Circuit's holding in *Smith* that § 1983 allows children to assert claims for deprivation of the parent-child relationship with our

conclusion that "section 1983 provides a cause of action which is *personal* to the injured party."

*Purnell v. City of Akron*, 925 F.2d 941, 948 n.6 (6th Cir. 1991).

Because Alex alleges that the defendants violated his right to familial integrity by trampling *his mother's* constitutional rights leading to her wrongful conviction, he raises a non-cognizable claim for a collateral injury.

### III. CONCLUSION

We AFFIRM the district court's grants of summary judgment on qualified-immunity grounds to Ferguson, Dr. Raker, and Ballantine for Virginia's *Brady* claims; AFFIRM the denial of Virginia's motion for summary judgment against Ferguson on her *Brady* claim; and AFFIRM the dismissal of, and grants of summary judgment on, Alex's familial-integrity claim.

**HELENE N. WHITE, Circuit Judge, concurring in part and dissenting in part.**

Although I agree that Defendants Raker and Ballantine are entitled to qualified immunity and that the district court properly granted Defendants judgment on Alex LeFever's family-integrity claims, my reasoning differs from the majority's and therefore I write separately to address these claims. Further, I do not agree that Ferguson is entitled to qualified immunity from Virginia LeFever's *Brady* claim based on Ferguson's past perjury, and respectfully dissent from that portion of the majority's opinion.

### I. Virginia LeFever

LeFever claims the prosecution failed to disclose favorable evidence in violation of her right to due process, and that Ferguson, Dr. Raker, and Ballantine are liable for money damages for their roles in that violation. In *Brady v. Maryland*, 373 U.S. 83 (1963), the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87. "Favorable" evidence, the Court later explained, includes both exculpatory and impeachment evidence. *United States v. Bagley*, 473 U.S. 667, 676–77 (1985). Further, favorable evidence is "material" for *Brady* purposes "when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Cone v. Bell*, 556 U.S. 449, 470 (2009). "In other words, favorable evidence is subject to constitutionally mandated disclosure when it 'could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" *Id.* (quoting *Kyles v. Whitley*, 514 U.S. 419, 435 (1995)).

Disclosure to the defense is ultimately "the responsibility of the prosecutor," *Giglio v. United States*, 405 U.S. 150, 154 (1972), who must "learn of any favorable evidence known to

the others acting on the government's behalf in the case." *Kyles*, 514 U.S. at 437. Thus, the government's disclosure obligation "encompasses evidence 'known only to police investigators and not to the prosecutor.'" *Strickler v. Greene*, 527 U.S. 263, 280–81 (1999) (quoting *id.* at 438). As a result, investigators have an "analogous or derivative obligation" of disclosure to the prosecutor. *Moldowan v. City of Warren*, 578 F.3d 351, 381 (6th Cir. 2009); *see also Carrillo v. County of Los Angeles*, 798 F.3d 1210, 1222 & n.14 (9th Cir. 2015) (citing cases). However, it is the prosecutor who must "gauge the likely net effect of all [undisclosed] evidence and make disclosure when the point of 'reasonable probability' is reached." *Kyles*, 514 U.S. at 419. When the prosecution fails to disclose material evidence, *Brady* holds that the defendant's right to due process has been violated, and the defendant is entitled to a new trial.

If the conviction is vacated, the criminal defendant may bring a § 1983 action for money damages. *Heck v. Humphrey*, 514 U.S. 477, 486–87 (1994); *Poventud v. City of New York*, 750 F.3d 121, 132–36 (2d Cir. 2014) (en banc). Both police officers and forensic investigators may be liable for withholding material evidence from prosecutors, causing the prosecution to violate the criminal defendant's *Brady* rights. *Moldowan*, 578 F.3d at 376–389 (police officers); *id.* at 396–97 (forensic investigators). However, because investigators lack legal training to evaluate materiality, we have required more than just nondisclosure before holding investigators personally liable for causing a *Brady* violation. First, police are liable if the exculpatory or impeachment value of the evidence is "apparent," meaning police "know or should know [the evidence] 'might be expected to play a significant role in the suspect's defense.'" *Moldowan*, 578 F.3d at 388 (quoting *California v. Trombetta*, 467 U.S. 479, 488 (1984)). *But see Owens v. Balt. City State's Atty.'s Office*, 767 F.3d 379, 396 & n.6 (4th Cir. 2014) (noting that some

circuits require bad faith). Second, forensic investigators are liable for "deliberately withholding" favorable evidence. *Moldowan*, 578 F.3d at 397.

Police officers and forensic investigators are entitled to qualified immunity from money damages if their constitutional duties were not "clearly established" at the time of a *Brady* violation. *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2080 (2011). Our court has held that both police officers and forensic investigators have had a clearly established duty to disclose favorable evidence since at least 1990. *Moldowan*, 578 F.3d at 381–82, 396–97. *But see Drumgold v. Callahan*, 707 F.3d 28, 43 (1st Cir. 1995) (suggesting police officers' duty was not clearly established until 1995). Here, LeFever's trial took place in 1990, and our cases dictate that her right to disclosure of favorable evidence by the defendants—subject to the relevant standards— was clearly established. Thus, the main question before us is whether LeFever has made out a *Brady* violation for which each of the three defendants can be held liable.

### A. Ferguson

To determine whether Ferguson is entitled to qualified immunity from money damages, I would first evaluate whether LeFever has made out a *Brady* violation, and then consider whether Ferguson can be held liable for that violation.

### 1. Undisclosed evidence

First, LeFever asserts that Ferguson failed to disclose his history of misrepresenting his credentials under oath. Past perjury is, of course, relevant to a witness's credibility. And, as a panel of this court concluded in *Westerfield v. United States*, 483 F. App'x 950 (6th Cir. 2012), past perjury by a government witness is considered impeachment evidence for *Brady* purposes, subject to disclosure. Other courts have reached this same conclusion, *e.g.*, *Simmons v. Beard*, 590 F.3d 223, 236 (3d Cir. 2009); *United States v. Cuffie*, 80 F.3d 514, 517–18 (D.C. Cir. 1996),

even when the undisclosed past-perjury evidence ultimately is not material to the outcome of the trial, *e.g.*, *United States v. Avellino*, 136 F.3d 249, 258–59 (2d Cir. 1998). Here, Ferguson's past perjury calls into question his credibility as a witness, regardless whether he graduated before LeFever's trial, or had the requisite credentials to serve as a forensic examiner throughout the investigation.

The majority suggests that in pursuing a *Brady* claim for failure to disclose a history of perjury, LeFever seeks to circumvent testimonial immunity, but cites no case holding that testimonial immunity extends to a *Brady* claim based on withholding of impeachment evidence consisting of past perjury. *Cf. Rehberg v. Paulk*, 132 S. Ct. 1497 (2012); *Briscoe v. LaHue*, 460 U.S. 325 (1983). As we explained in *Gregory v. City of Louisville*, 444 F.3d 725 (6th Cir. 2006), "absolute testimonial immunity does not 'relate backwards' to 'protect a defendant for any activities he allegedly engaged in prior to taking the witness stand for his testimony.'" *Id.* at 738 (quoting *Mastroianni v. Bowers*, 160 F.3d 671, 677 (11th Cir. 1998)) (alterations omitted). "Merely because a state actor compounds a constitutional wrong with another wrong which benefits from immunity is no reason to insulate the first constitutional wrong from actions for redress." *Id.* at 739. Ferguson continued to misrepresent his credentials at LeFever's trial, but his past perjury would be impeachment evidence regardless, and his withholding of that evidence is distinct from his testimony at her trial.

Next, LeFever argues that Ferguson should have disclosed the manuscript—titled "Angel of Mercy or Angel of Death?"—that he wrote about William LeFever's death. R. 92-16, PID 2147–72. Ferguson, in the role of protagonist, describes his investigation into William LeFever's death, and explains how he solved the murder through forensic analysis. *Id.* at PID 2158–68. LeFever, in the title role, is portrayed as her husband's murderer, and Ferguson

imagines, in lurid detail, her actions on the night her husband was poisoned. *Id.* at PID 2169–72. Further, Ferguson implies that LeFever may have been responsible for the deaths of other family members—two of her children, her father-in-law, and her sister-in-law, all of whom allegedly died under her care—and accuses LeFever of "tak[ing] a particular pleasure" when patients would die at the hospital where she worked as a nurse. *Id.* at PID 2148–49.

In LeFever's criminal trial, the manuscript could have been used as evidence of bias or an interest in her conviction. Courts have long held that a financial interest in the outcome of a trial is impeachment evidence, and the authorship of a marketable manuscript is no different. *See, e.g.*, *United States v. Reed*, 437 F.2d 57, 58–59 (2d Cir. 1971) (per curiam). The Fifth Circuit recognized as much in a *Brady* case, *United States v. Edwards*, 442 F.3d 258, 267–68 (5th Cir. 2006), although ultimately concluding that the witness's book was not material. Ferguson stated in his 2012 deposition that he had no intent to sell the manuscript and subsequently made no attempt to market it, R. 92, PID 1967, but this post hoc explanation does not affect the manuscript's impeachment value in 1990. Thus, the manuscript is properly considered impeachment evidence subject to disclosure under *Brady*.

Lastly, I agree LeFever's claim that Ferguson should have disclosed his "true conclusions" is barred under the reasoning of our previous judgment in this case. *LeFever v. Ferguson*, 567 F. App'x 426, 431 (6th Cir. 2014).

### 2. Materiality

Even if the past perjury and manuscript are impeachment evidence subject to disclosure, LeFever cannot establish a *Brady* violation unless the undisclosed evidence was material. *Strickler*, 527 U.S. at 281–82. The Supreme Court has explained that the materiality of undisclosed evidence must be "considered collectively, not item by item," *Kyles*, 514 U.S. at

436, so the effect of Ferguson's past perjury and his manuscript must be considered together. To determine whether there was a reasonable probability of a different outcome, I would look no further than the trial court's decision to vacate LeFever's conviction.

LeFever was convicted in a bench trial, and the same trial judge presided over her post-conviction proceedings. The trial judge granted LeFever a new trial after Ferguson's history of perjury came to light, explaining:

> This judge was convinced of the defendant's guilt on February 22, 1990. I don't know if I feel any different today. This is about fairness. Is it fair to let a verdict stand, when it is based in large part on the testimony of a proven liar? And the proven liar was the key witness in the case!

R. 114-4, PID 4027. The trial judge further noted that Ferguson was the "key witness to the State's case," and that the other forensic examiners "relied heavily on testing done by Ferguson in making their findings." *Id.* at PID 4026. "Ferguson was the linchpin holding the State's case together. Without his testimony, the State's case would have fallen apart." *Id.* Thus, the trial judge believed there could be no confidence in his own verdict, given the importance of Ferguson's testimony to his decision and the credibility issues raised by Ferguson's history of perjury. Because the trier of fact lost confidence in his own verdict, so must we. Thus, in my view, LeFever has made out a *Brady* violation.

### 3. Liability

A forensic examiner can be held liable for "deliberately withholding" favorable evidence. *Moldowan*, 578 F.3d at 397. Here, Ferguson purposefully misrepresented his credentials for years, and continued to lie about his graduation date even after he graduated. Thus, I conclude that Ferguson deliberately withheld his past perjury. However, nothing in the record suggests that Ferguson deliberately concealed the manuscript, which he shared with colleagues, although not the prosecution. Nor would the relevance of the transcript for impeachment be apparent to

him. In sum, Ferguson can be held liable for depriving LeFever of her clearly established rights with respect to the past perjury but not the manuscript. I would reverse the district court's grant of summary judgment to Ferguson on the *Brady*/past perjury claim.

### B. Dr. Raker and Ballantine

I agree with the majority that Dr. Raker, a coroner, and Ballantine, a detective, are entitled to qualified immunity, even though Ferguson's manuscript was impeachment evidence that should have been disclosed. LeFever has not alleged or established that Dr. Raker "deliberately with[e]ld" the manuscript from the prosecution. *Moldowan*, 578 F.3d at 396–97. Ballantine apparently did not even know about the manuscript—in depositions, both Ferguson and Ballantine testified that Ferguson never showed the manuscript to Ballantine, and LeFever offers only conclusory allegations that Ballantine must have known. Further, the impeachment value of the manuscript would not have been "apparent" to Dr. Raker or Ballantine such that they would have known that it "might be expected to play a significant role" in LeFever's defense, or that they were required to inform the prosecutor. *Id.* at 382.

### II. Alex LeFever

As I read the complaint, Alex LeFever ("Alex") does not seek relief for the violation of his mother's constitutional rights. Rather, he claims that his mother's wrongful conviction violated his own due-process right to family integrity. In *Jaco v. Bloechle*, 739 F.2d 239 (6th Cir. 1984), the court held that a mother could not bring a § 1983 action for a violation of her son's rights, but the plaintiff did not argue that her son's death violated her own constitutional rights. And in *Purnell v. City of Akron*, 925 F.2d 941 (6th Cir. 1991), the court considered a § 1983 claim "for deprivation of the parent-child relationship in the wrongful death context," but expressly declined to "address the merits of [this] difficult question." *Id.* at 948 n.6. The court

noted other circuits had held that "a decedent's immediate family may bring a section 1983 claim for deprivation of the parent-child relationship in the wrongful death context," and that there was legislative history supportive of those cases. *Id.* The court then compared these authorities with *Jaco*'s holding that a § 1983 action must be "*personal* to the injured party," but the court did not purport to decide whether *Jaco* foreclosed a § 1983 family-integrity claim in our circuit. *Id.* Thus, I am not convinced that Alex failed to raise a cognizable § 1983 claim.

In any event, I would find that the individual defendants are entitled to qualified immunity because the right to family integrity in this context was not clearly established in 1990. *Cf. al-Kidd*, 131 S. Ct. at 2084 (instructing courts "not to define clearly established law at a high level of generality"). To demonstrate a clearly established right, Alex mainly relies on cases addressing state regulation of families. *E.g.*, *Lehr v. Robertson*, 463 U.S. 248 (1983); *Santosky v. Kramer*, 455 U.S. 745 (1982); *Lassiter v. Dep't of Soc. Servs.*, 452 U.S. 18 (1981). In these cases, the state purposefully separated a child from a parent by interfering with a custodial relationship. Here, in contrast, Alex's separation from his mother was incidental to her incarceration, and the cases did not clearly establish that wrongful incarceration was an unconstitutional interference with a parent-child relationship at the time of LeFever's conviction.

### III. Conclusion

For these reasons, I join the affirmance, except with respect to the district court's grant of summary judgment to Ferguson in LeFever's case.